Jeremiah J. Salamon
No. 91052-038
Fort Dix - FCI
5756 Hartford & Pointville Road
Post Office Box 2000
Joint Base MDL, New Jersey  08640-0902

RECEIVED

JAN  6 2023

AT 8:30_____M
WILLIAM T. WALSH
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CAMDEN DIVISION

Jeremiah J. Salamon, In Propria Persona,
                    Petitioner,

    vs.

Stevie Knight,  Warden/C.E.O.
        of Fort Dix - FCI,
                    Respondent.

The Honorable _____

Case No.: _____

Noted: December 31, 2022

---

Memorandum of Law in Support of 28 U.S.C. §§§ 2241, 2242 & 2243
by a Person in Federal Custody
in Appeal of Fort Dix Disciplinary Hearing Decision

---

## I. PRELIMINARY STATEMENT

COMES NOW, Jeremiah Salamon, a litigant appearing In Propria Persona, and Citizen of the United States of America, and by birth and life-long domicile a Citizen of the State of Massachusetts, who respectfully submits this Memorandum of Law in Support of Habeas Corpus pursuant 28 U.S.C. §§§ 2241, 2242 & 2243 as a person in Federal Custody. Petitioner is serving a sentence for a violation of the Code of Laws of the United States (aka: "U.S.C" or "U.S.C.S."), Name and Location of Sentencing Court: United States District Court (USDC) for the District of Massachusetts, Springfield Division; Docket No. 3:09-cr-30021-01-MAP; Date of Sentencing: May 24, 2011. The USDC notified Petitioner he is sentenced pursuant a Judgment in a Criminal Case. "Crime" is not a term used in the USDC Judgment Order. Petitioner is a non-contact, non-violent offender with no prior criminal convictions, or gang, terrorist or organized crime affiliation. Petitioner is held in custodial legal in a political subdivision on Joint Base McGuire-Dix-Lakehurst, a military base, known as "Fort Dix - Federal Correctional Institution", which is within the State of New Jersey, whose Warden/C.E.O. has violated Petitioner's Constitutional, Procedural and Statutory Rights.

- 1 -

The Fourteenth Amendment provides that "[n]o State shall... deprive any person of life, liberty, or property, without due process." U.S. Const. Amend. XIV, § 1, And the Supreme Court has decided that incarceration does not divest a prisoner of all Constitutional Rights; and Requirements of Procedural Due Process appropriate of the circumstances must be observed, <u>Wolff v. McDonnell</u>, 418 U.S. 539, 555-56, 41 L.Ed.2d 935, 94 S.Ct. 2963 (1974). Under 28 C.F.R. § 541.17 are the rights guaranteed to each inmate during the discipline action process, which were upheld and solidified in <u>Wolff v. McDonnell</u>, <u>Supra</u>. This case stems from the depravation of Petitioner's Right to a Disciplinary Hearing Officer who is impartial, in a Hearing that abides by the Standards as an accountable Hearing of Record, and in which Petitioner's Right to call and present witnesses in his defense are upheld, respected and honored; which would prove Petitioner's Self-Defense alibi and the fact that evidence relied on to find him guilty of an infraction was inaccurate. "A full hearing with all Due Process Safeguards is required," <u>Wolff v. McDonnell</u> in <u>Overton v. Bazetts</u>, 539 U.S. 138 No. 02-94, June 16, 2003). As a result of these depravations, which are well documented hereinafter, Petitioner's Fifth Amendment Right to Due Process was violated, amongst other Constitutional Rights, and the disciplinary sanctions were issued erroneously. The only just solution to this violation is granting relief under 28 U.S.C. §§§ 2241, 2242 & 2243 for the violation of Petitioner's Constitutional Rights by the Bureau of Prisons who, by Contract, are in care of Petitioner on behalf of the Attorney General.

## II. JURISDICTION & VENUE

This Honorable Court has the Jurisdiction in this matter pursuant to 28 U.S.C. § 2241 wherein the Petitioner raises a Constitutional challenge to, an alleged, "Disciplinary Hearing", conducted by the Bureau of Prisons' Staff, calling himself a "Disciplinary Hearing Officer", which violated the Petitioner's Fifth Amendment Right to Due Process. Because Petitioner is in the custody of the Attorney General, by way of the Federal Bureau of Prisons; 28 U.S.C. § 2241(c)(1) and (3) grant this Honorable Court Jurisdiction.

The Petitioner invokes the Jurisdiction of this Honorable Court pursuant to 28 U.S.C. § 1331 and § 1343(a)(4), as this action arises out of the Consitution and Laws of the United States of America and the Petitioner seeks to address the deprivation of Rights guaranteed him by the Constitution of the United States of America and Federal Statutes.

- 2 -

The United States District Court for the District of New Jersey, Camden Division, is the appropriate venue under 28 U.S.C. § 1391(b)(2) because all, or a substantial portion, of the events or omissions giving rise to this Petition occurred in this district.

### III. STANDING

The core component to a Petitioner's Standing to invoke the authority and Jurisdiction of a federal Court is derived from Article III of the Constitution of the United States of America. Factually, the Petitioner has suffered by way of actual and threatened injury by deprivation of legally protected Rights, due to punitively unlawful conduct of the other party. The injury "(1) fairly can be traced to the challenged action, and is likely to be redressed by a favorable decision [by this Honorable Court] by requested relief." International Primate Protection League v. Administrators of Trulane Educational Fund, 500 U.S. 72, 114 L.Ed.2d 134, 111 S.Ct. 1700 (1991). Thus, Petitioner also has Standing to assert his claim, and the process of this 28 U.S.C. § 2241, because Petitioner is asserting that his "right of access to the Courts," Simkins v. Bruce, No. 04-3072, 406 F.3d 1239, 2005 U.S. LEXIS 8073 (10th Cir. May 9, 2005), along with his Constitutional Right to petition the Government for redress of grievances United States Constitutional Amendment I (1st), has been denied. And Petitioner's Right to challenge his Due Process to prisons disciplinary proceedings has been prejudiced, Wolff v. McDonnell, Id., and his Constitutional Rights of the Due Process Clause of the Constitution of the United States, Amendment XIV (14th) and V (5th), have been denied.

### IV. PETITIONER

Jeremiah Salamon, a litigant appearing In Propria Persona, is a natural-born Citizen of the United States of America and by birth and permanent domicile of the State of Massachusetts, a Citizen of the State of Massachusetts, who is presently held in custodial legis within the boundaries of the political subdivision known as Fort Dix - FCI, which is located on the military base "Joint Base McGuire-Dix-Lakehurst", at 5756 Hartford & Pointville Road, Fort Dix, in the State of New Jersey. Physically held with and identically to State of New Jersey's undocumented climinal Alien Federal inmate population the State incarcerates for payment under State Criminal Alien Assistance Program.

#### A. PRO SE LITIGATION STANDARDS

I request this Honorable Court to give my In Propria Persona pleadings liberal construction, ("It is the policy of the courts to give a liberal

construction to pro se habeas petitions." (internal quotation marks and citations omitted.) United States v. Otero, 502 F.3d 331, 334 (3d. Cir. 2007) ("we contrue pro se pleadings liberally.") (citing Hanes v. Kerner, 404 U.S. 519, 520, 30 L.Ed.2d 652, 92 S.Ct. 594 (1972)). Pro Se litigants pleadings are to be construed liberally of their sufficiency and held to a less stringent standard than formal pleadings drafted by lawyers, Erickson v. Pardus, 551 U.S. 89, 94, 167 L.Ed.2d 1081, 127 S.Ct. 2197 (2007). If the Court can reasonably read and understand pleadings to state valid claims on which the litigant can prevail, it should do so despite failure to site proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleadings requirements, Hughes v. Rowe, 449 U.S. 5, 66 L.Ed.2d 165, 101 S.Ct. 173 (1980). See also Gomez v. USAA Federal Savings Bank, 171 F.2d. 794, 795-90 (2d Cir. 1999).

## V. RESPONDENT

Stevie Knight  is the Warden/C.E.O. of Fort Dix - FCI, a low- and minimum-security complex, and political subdivision, located on the military base "Joint Base McGuire-Dix-Lakehurst", at 5756 Hartford & Pointville Road, Fort Dix, in the State of New Jersey. Whom is the acting agent for the Federal Bureau of Prisons (FBOP), is legally responsible for the overall operation of Fort Dix - FCI, oversees the day-to-day operations of Fort Dix - FCI, the training of Staff pursuant to FBOP Program Statement Directive 3420.11, and for the welfare of all inmates within this prison and political subdivision.

## VI. LEGAL STANDARD

Title 28 U.S.C. § 2241 provides, in relevant part:

> (a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The Order of a circuit judge shall be entered in the records of the district Court of the district Court wherein the restraint complained of is had.
>
> ...
>
> (c) The writ of habeas corpus shall not extend to a prisoner unless -
>
> > ...
> >
> > (3) He is in custody in violation of the Constitution or laws or treaties of the United States;...

The violation of my Right to Due Process not only goes against the Constitution of the United States, but also violates the United States statutory Rights granted by Congress.

Bureau of Prisons "Federal prisoners serving a term of imprisonment of more than one year have a statutory right to receive credit toward their sentence for good conduct." Denny v. Schultz, 708 F.3d 140, 143 (3d Cir. 2013) (citing 18 U.S.C. § 3624(b); 28 C.F.R. § 523.20 (2008)). Based on this statutory created Right, "a prisoner has a constitutionally protected liberty interest in good time credit." Id. (quoting Young v. Kann, 926 F.2d 1396, 1399 (3d Cir. 1991) (citing Wolff v. McDonnell, Supra.)). Carmona v. Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001) (habeas appropriate for challenge to disciplinary sanctions including loss of good time).

Pursuant 5 U.S.C. § 551(1)(2)(14), Bureau of Prisons is an "agency" within definition of this section, and its rule making is subject to applicable requirements of the Administrative Procedure Act (APA). Ramer v. Saxbe, 552 F.2d 695, 173 U.S. App. D.C. 83 (D.C. Cir. 1975) "[W]e recognize in the context of this case that the Bureau of Prisons is, indeed, an 'agency' within the definition of the Administrative Procedure Act, 5 U.S.C. § 551, and that its rule making is subject to applicable requirements of that Act."; See also: Simmat v. United States Bureau of Prisons, 413 F.3d 1225 (10th Cir. 2005) (Defendant Bureau of Prisons (BOP) was agency within meaning of 5 U.S.C. § 551(1) and sovereign immunity waiver 5 U.S.C. § 702 was not limited to suits under APA; thus, district court had jurisdiction over BOP in federal inmate's Eight Amendment deliberate indifference to serious dental needs claim.).

- 5 -

Therefore, the district court can review an agency decision under the Administrative Procedures Act (APA), 5 U.S.C. § 706, which provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning of applicability of the terms of an agency action. The reviewing court shall –

    (1) compel agency action unlawfully withheld or unreasonably delayed; and

    (2) hold unlawful and set aside agency action, findings, and conclusions found to be –

        (A) arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law;

        (B) contrary to constitutional right, power, privilege, or immunity;

        (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

        (D) without observance of procedure required by law;

        (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 U.S.C. §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or

        (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the forgoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**Title 28 U.S.C. § 2242 provides:**

Application for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf.

It shall allege the facts concerning the applicant's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known.

It may be amended or supplemented as provided in the rules of procedure applicable to civil actions....

"If the petitioner is currently in custody under state-court judgment the petition must name as respondent the state officer who has custody." Rule 2(a) of the rules Governing Section 2254 in the United States District Courts. The note to that Rule provides that the proper respondent is usually the warden of the institution in which the petitioner is incarcerated or the chief officer in charge of state penal institutions. More recently, the Supreme Court has indicated that "there is generally only one proper respondent to a given prisoner's habeas petition..." Runsfield v. Padilla, 542 U.S. 426, 434-35, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004). The Rules Governing Section 2254 Cases provide that a

petitioner must "specify all the grounds for relief available" and "state the facts supporting each ground" in the initial petition. Habeas Corpus Rule 2(c). An amendment, however, to a pleading related back to the date of the original pleading when "the amendment asserts a claim of defense that arose out of the conduct, transaction, or occurance set out - or attempted to set out - in the original pleading. Federal Rule of Civil Procedure 15(c)(1)(B).

Title 28 U.S.C. § 2243 provides, as pertinent:

A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto.

The writ, or order to show cause shall be directed to the person having custody of the person detained. It shall be returned within three days unless for good cause additional time, not exceeding twenty days, is allowed.

When the writ or order is returned a day shall be set for hearing, not more than five days after the return unless good cause additional time is allowed.

The applicant of the persons detained may, under oath, deny any of the facts set forth in the return or allege any other material facts.

The return and all suggestions made against it may be amended, by leave of court, before or after being filed.

The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require.

## VII. FACTS OF THE CASE BEFORE THE COURT

1.      On the morning of May 27, 2020, in Fort Dix - FCI Housing Unit 5841, I entered the televison room and sat on the permanently floor affixed concrete bench between prisoners Edward Leon (hereinafter: "Leon") and Shawn Rockey (hereinafter: "Rockey"). Intending to have a conversation with Leon, I naturally sat closer to him. Shortly after initiating the conversation with Leon, Rockey interrupted by saying, "Why do you have to sit so close?"

I replied, "I'm not sitting close, there's definately more space than if a chair was here." (Typically chairs are used in the television room. There was nearly two (2) feet between myself and Rockey.)

"But a chair would be empty," Rockey irrationally reasoned. (If a chair were there, the person assigned to that chair would have been occupying it.)

I stated, "I'm not going to argue with you," and I resumed the conversation with Leon.

After a minute or so, Rockey piped, "There are all these other places to sit, but you have to sit here!" While waving his arms about the room.

I replied, "I'm here to talk to Leon," and I attempted to resume the conversation with him.

Rockey stated, "There is no point in arguing with an idiot."

I replied, "That is what it would be if I were to argue with you."

Rockey then mumbled something incoherent under his breath about working in Unicor. (Unicor is the name of the Federal Prison Industries that assemblies textiles via sewing; where nearly all occupants of Housing Unit 5841 work.)

After about two minutes, Rockey interrupted Leon and I again by demanding, "Why don't you stay away from me and I'll stay away from you," By the end of which he was yelling.

I calmly said, "Don't yell at me."

Rockey then bolted out of his chair, his cane held in his left hand, and towered over me while I was still seated and yelled, "OR WHAT!"

I looked up at his impossing and threatening stance and calmly stated, "It's not going to end the way you want it..."

Then, - Wham! Wham! - before I could finish speaking, Rockey punched me on the left side of my forehead, knocking my hat off my head, and then a glancing blow to my left eye. It took me a moment to react to being attacked. While Rockey swung back for another shot, I stood up and defended myself. I needed to get away from the assault, but being seated on an unmovable concrete bench with a larger person

- 8 -

over me, I had no avenue of escape. As such, I took my left hand and put it up to the left side of my head in an effort to block the oncoming hits. And then took my right hand and braced it across my chest and plowed into Rockey. Rockey quickly fell over the concrete bench that was behind him. Now on the ground, I went over and kneeled next to Rockey and asked, "Did you get that out of your system? Are you done? Have you had enough?"

Rockey did not reply, instead, he got to his feet.

Seeing blood dripping from his head, I asked, "Are you okay?"

Rockey blocked the doorway and then attacked me again. I deflected this second attack and pushed him to the ground and said, "I'm done with you."

I proceeded to leave the television room, but Rockey quickly got to his feet and pursued me again, swinging his cane at my head.

I was able to defect this third attack with my left arm and finally made it out of the television room. I then went to the bathroom to see if I was bleeding from my head, face or arm; which I was not. Although I did have a red mark on my forehead and lump on my arm from where I was hit with the cane. Fairly unscathed, I reported to work approximately half an hour later.

At work, I ran into Leon where I asked him, "If that turns into anything, will you be a witness and write a statement of what happened.

Leon replied, "Yes, not a problem."

2.     At approximately 10:00 am, I was paged to the Shop Foreman's office. When I arrived, a Compound Officer was there to escort me from Unicor to the Medical building.

3.     At the Medical Building, a Health Services Physician told me they were informed I was possibly in an altercation and that I needed to undress for an examination. I undressed and the Physician examined me, not finding any wounds or indication of an altercation. Then I was asked if I had, "been in a fight?"

I replied, "No, do you see anything that indicates I have been?"

They replied, "No, but that does not mean something did not happen. So, did something happen?"

I answered, "I have nothing to say."

I was then instructed to get dressed. Once dressed, the Compound Officer escorted me to the Lieutenant's Office.

4.     At the Lieutenant's Office, I met with Special Investigative Section (SIS) Lieutenant M. Fernandez. He started, "I know you have been in a fight, so why don't you tell me what happened?"

- 9 -

I replied, "I have nothing to say."

He responded, "Let me tell you how this goes. I already have half a dozen inmates that said you were in a fight with... [he reviewed a document on his desk] Shawn Rockey, so, considering that Shawn has a cut on his head, and you don't appear to have any injuries, I have all the information I need to pin this on you; unless you can tell me otherwise, that's what I'm going to do. You're already going to the SHU, for how long does not matter to me."

Left with little option, I informed M. Fernandez of the attack by Rockey, as outlined in paragraph 1 of this Section. I further explained that I only reacted in self-defense. That once I was attacked by a much larger person, one armed with a weapon, while I was seated on an immovable concrete bench with no means of escape, I had to find a way to get away from the assault. I did not attack or hit Rockey. And that just because Rockey turned out worse for wear does not mean there was a mutually combative fight. Instead, I explained, I showed Rockey restraint, compassion and concern. I showed restraint by not attacking Rockey after he hit me numerous times; I showed concern by taking interest in his well-being, and I showed compassion by leaving the situation without reprisal or retaliation. I then removed my hat and revealed the red mark on my head, and then the welt on my arm; which Lieutenant M. Fernandez remarked were all "defense wounds." Lieutenant M. Fernandez took pictures of my injuries. At approximately 11:00 am, I was escorted to the Sensory Deprivation and Isolation Unit (or sanitized name: SHU).

5.     Immediately upon placement in a Sensory Deprivation and Isolation Unit cell, I wrote down everthing, in detail, that had transpired that day, know that keeping a detailed accounting is the best way to retain an accurate record.

6.     On June 8, 2020 at 10:44 am, Lieutenant J. Marcucci delivered to me an INCIDENT REPORT, date and time stamped "June 8, 2020 9:35 AM", for a violation of high severity level prohibited act offence code 201 - Fighting with another person (Exhibit A). Immediately, I noticed numerous inaccuracies, especially the parts where Lieutenant M. Fernandez claimed to have quoted me, and I notified Lieutenant J. Marcucci of such. To which, he told me someone would meet with me to make corrections.

7.     On June 10, 2020, I was released from the Sensory Deprivation and Isolation Unit. This release was coordinated to happen at the same time Rockey was also released. The escorting officers made comments that they hoped something would happen between us. Much to their disappointment, nothing happened. I was reassigned

- 10 -

to Housing Unit 5802, Shawn Rockey was reassigned to Housing Unit 5811.

8.      On June 12, 2020, I met with 5802 Housing Unit Counselor J. Cuevas where he took my verbal and written statement that corrected the errors in the Incident Report. I also notified Counsel J. Cuevas that I wished for a Staff Representative, specifically Gary Moody, to be present at the Disciplinary Hearing; and prisoners Edward Leon, Wilson, and others that I did not know the names of that were present in the television room during the incident, but could obtain if given the opportunity to speak with Edward Leon. Counselor J. Cuevas issued me a copy of a NOTICE OF DISCIPLINE HEARING BEFORE THE (DHO) (Exhibit B) indicating Gary Moody as the Staff Representative and only Edward Leon as a witness. When I questioned J. Cuevas about this, he told me he could not find a Wilson in the computer and that I could ask for the additional witnesses at the Disciplinary Hearing.

9.      On June 30, 2020 at 10:26 am, I met with K. Hampton, who introduced himself as a "Disciplinary Hearing Officer," in Staff Alley of Housing Unit 5802, where, again, I had to express my interest in having Edward Leon and others as witnesses during the Disciplinary Hearing proceedings. Due to the Coronavirus pandemic and the imposed lockdown conditions, Staff Representative Gary Moody and Witness Edward Leon and others were not available, and K. Hampton was forced to reschedule the Disciplinary Hearing.

10.      On August 28, 2020 at 10:28 am, I was sent to the Lieutenant's Office for the Disciplinary Hearing. I met with J. Darden, in the putative title of "Disciplinary Hearing Officer," where, once again, due to the Coronavirus pandemic and the imposed lockdown, Staff Representative Gary Moody, and Witness Edward Leon and others were not available. A phone call was made to Staff Representative Gary Moody regarding the requirement of the presence of witnesses, or at least written statements from them for presentation at the Disciplinary Hearing. Gary Moody told me he would try to get written statements from Witness Edward Leon and others before the rescheduled Disciplinary Hearing date.

11.      On September 2, 2020 at 11:20 am, again, I was sent to the Lieutenant's Office for the Disciplinary Hearing and met with J. Darden. This time, Staff Representative Gary Moody was only available via a phone call, where he assured me he had reviewed the Incident Report. He was also unable to get a witness statement from any witnesses, but I had the right to call them. I then requested Edward Leon and an inmate with either the first or last name of Wilson be brought in as witnesses. J. Darden refused. I then pushed the issue of having a right to call witnesses, but J. Darden still refused to call any. J. Darden then proceeded with

- 11 -

the Disciplinary Hearing. I started by asking him a question I had prepared in writing, "By what Power do you have to conduct this hearing without a record and without notice to me of the nature and cause of my liability to loss of liberty and property by your adjudication, as required by the 14th and 5th Amendment of the Constitution of the United States?"

J. Darden replied, "I'm DHO."

I questioned, "What is DHO, and by what Power do you have authority to conduct this unconstitutional hearing?"

Clearly frustrated, J. Darden answered, "I'll tell you who I am! I'm the Disciplinary Hearing Officer, and I do whatever I want. We are going to conduct this hearing today with or without you. If you don't like it, I will send you to the SHU right now and then I will come to my own conclusion without you, and I promise it will not be favorable to you. It will be at least a year before you get out of the SHU. Do you understand?"

Under duress, I replied, "No, but obviously you are leaving me no choice. You are going to do what you want."

J. Darden then commenced the Disciplinary Hearing, where I again submitted another copy of the written corrected record of the event, as the previous attempts at correction had not been made to the Incident Report. J. Darden, took the copy, but refused to read it. At that point, I insisted on reading it to him. In the end, J. Darden did not care what I had to say, and found me guilty of the Prohibited Act Code 201 - Fighting with another person. Subsequently, J. Darden sanctioned me to 60 Days of Disiplinary Segregation (suspended for 180 Days pending clear conduct) (Exhibit C); 180 Days of Loss of Visiting Privileges (Exhibit C); and the loss of 27 Days Good Conduct Time (Exhibits C & D). Then there are the unwritten punitive collateral consequences, to include, an increase in Custody Classification Score (Exhibit E); Loss of Employment in Unicor; Loss of housing in the Honor Unit 5841; Loss of Placement in a Preferred Housing Two-Man room for one year, and permanent record of a violent offense, which can have an adverse effect in in-custody living conditions and future decisions made by Staff, as well as in post-release, in the eyes of a Probation Officer, which will lead to the imposition of more stringent rules and restrictions of Supervised Release.

## VIII. REQUIREMENTS UNDER THE PRISON LITIGATION REFORM ACT

The Prison Litigation Reform Act (PLRA), pursuant to 42 U.S.C. § 1997e, provides as follows:

> No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983]... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such adminstrative remedies as are available are exhausted.

As such, the Bureau of Prisons has established a grievance procedure/system for prisoners seeking to challenge their conditions of confinement, codified at 28 C.F.R. § 542.10 Administrative Remedy Program.

To initiate the process, pursuant to 28 C.F.R. § 542.13(a) Informal Resolution, "...an inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy." Pursuant to 28 C.F.R. § 542.13(b) "An informal resolution attempt may be waived in individual cases at the Warden or institution Administrative Remedy Coordinator's discretion when the inmate demonstrates an acceptable reason for bypassing informal resolution." Pursuant to 28 C.F.R. § 542.14(c) Form. (1) "The inmate shall obtain the appropriate form [hereinafter: "Form"), INFORMAL RESOLUTION FORM (FTD 1330.18) (November 18, 2014)) (hereinafter: "BP-8"); REQUEST FOR ADMINISTRATIVE REMEDY (BP-229(13)) (April 1982) (hereinafter: "BP-9"); REGIONAL ADMINISTRATIVE REMEDY APPEAL (BP-230(13)) (June 2002) hereinafter: "BP-10"); CENTRAL OFFICE ADMINISTRATIVE REMEDY APPEAL (BP-231(13)) (April 1982) (hereinafter: "BP-11")], from CCC staff or institution staff (ordinarily, the correctional counselor)." Staff at Fort Dix - FCI have also imposed their own additional unwritten requirement to the Administrative Remedy Process. For a Form to be considered valid it **must** have either a Staff signature or initials along with the date the Form was issued. Any Form submitted without this requisite information is either refused by Staff or accepted but not processed (i.e., shredded); (2) "The inmate shall place a single complaint or a reasonable number of closely related issues on the form" in the section labeled "Date the incident complained of occurred:" and "Complaint and relief requested:," the responding staff fills in Part B, which is labeled "CORRECTIONAL COUNSELOR:" and then returns the Form to the inmate,; (3) "If more space is needed, the inmate may use up to one letter size (8½" by 11") continuation page. The inmate must provide an additional copy of any continuation page."; (4) "The inmate shall date and sign the request and submit it to the institution staff member designated to

- 13 -

receive such Requests (ordinarily a correctional counselor)." If the prisoner is dissatisfied with the results of the INFORMAL RESOLUTION (BP-8) response, the inmate must pursue a three-step review process.

At the first level, the prisoner must obtain the appropriate BP-9 Form from institution Staff (ordinarily, the correctional counselor, or in their absence, another member of Unit Team), which states: "Type or use ball point pen. If attachments are needed, submit four copies." The prisoner fills in Part A, which is labeled "INMATE REQUEST". The inmate then must submit it to the institutional staff member designated to receive such Requests (ordinarily a correctional counselor, or in their absence, another member of Unit Team). The Warden, or designated responding staff, fills in Part B, which is labeled "RESPONSE" and then returns the Form to the inmate.

If the prisoner is dissatisfied with the results of the REQUEST FOR ADMINISTRATIVE REMEDY (BP-9) response, the prisoner must proceed to second level of review conducted by the Regional Administrative Coordinator at the Regional Office. The prisoner must obtain the appropriate BP-10 Form from institution Staff (ordinarily, the correctional counselor, or in their absence, another member of Unit Team), which states: "Type or use ball point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) [BP-9] including any attachments must be submitted with this appeal." The prisoner fills in Part A, which is labeled "REASON FOR APPEAL". The inmate then must mail it to the Regional Director for the region in which the inmate is currently located. The Regional Director fills in Part B, which is labeled "RESPONSE" and then returns the Form to the inmate.

Pursuant to 28 C.F.R. § 542.14 (d) Exception to Initial Filing at Institution. (2) "DHO Appeals. DHO appeals shall be submitted initially to the Regional Director for the region which the inmate is currently located."

If the prisoner is dissatisfied with the results of the REGIONAL ADMINISTRATIVE REMEDY (BP-10) response, the prisoner must proceed to third level of review conducted by the General Counsel at the Central Office in Washington, D.C. The prisoner must obtain the appropriate BP-11 Form from institution Staff (ordinarily, the correctional counselor, or in their absence, another member of Unit Team), which states: "Type or use ball point pen. If attachments are needed, submit four copies. One copy of the completed BP-230(13) [BP-10] including any attachments must be submitted with this appeal." The prisoner fills in Part A,

which is labeled "REASON FOR APPEAL". The inmate then must mail it to the General Counsel at the Central Office in Washington, D.C.  The General Counsel fills in Part B, which is labeled "RESPONSE" and then returns the Form to the inmate.

This process is completed in the following timeline outlined in 28 C.F.R. § 542 et. seq. Pursuant to 28 C.F.R. § 542.15 (a) Submission. "An inmate who is not satisfied with the Warden's results must submit an Appeal on the appropriate Form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed response. An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate Form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response."

Pursuant to 28 C.F.R. § 542.18 Response Time. "If accepted, a Request for Appeal is considered filed on the date it is logged into the Administrative Remedy index as received. Once filed, response shall be made by the Warden or CCM within 20 calendar days; by the Regional Director within 30 calendar days; and by the General Counsel within 40 calendar days.... If the time period for response to a Request of appeal is insufficient to make an appropriate decision, the time for response may be extended once by 20 days at the institution level, 30 days at the regional level, or 20 days at the Central Office level. Staff shall inform the inmate of this extension in writing. Staff shall respond in writing to all filed Requests or Appeals. If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level."

Furthermore, "[t]he Attorney General's regulations, 28 C.F.R. § 40.1 - 40.22 [Minimum Standards for Inmate Grievance Procedures], add to the sketchy criteria set out in 42 U.S.C.S. § 1997e. In several ways they track the statute. But they add... requirements: (1) that prisoners participate in the formulation, operation, and assessment of the grievance procedures, § 40.2," Lewis v. Meyer, Nos. 86-1886, 86-2753, 815 F.2d 43; 1987 U.S. App. LEXIS 3938; (2) § 40.3 - Each inmate shall be entitled to invoke the grievance procedure regardless of any disciplinary, classification, or other adminstrative or legislative decision to which the inmate may be subject; (3) § 40.5 - At a minimum, the grievance procedure shall permit complaints by inmates regarding policies and conditions within the jurisdiction of the institution or the correctional agency that affect them personally, as well as actions by employees and inmates, and incidents occurring within the institution that affect them personally. The grievance

procedure shall not be used as a disciplinary procedure; § 40.6 - The grievance procedure shall afford a successful grievant a meaningful remedy; § 40.7(a) - The procedures for initiating a grievance shall be simple and include the use of a standard form. Necessary materials [forms] shall be freely available to all inmates and assistance shall be readily available for inmates who cannot complete the forms themselves. Forms shall not demand unnecessarily technical compliance with formal structure or detail, but shall encourage a simple and straightforward statement of the inmate's grievance; § 40.7(b) - The institution shall provide for an advisory role for employee and inmates in the operation of the grievance system; § 4-.7(c) - No inmate or employee who appears to be involved in the matter shall participate in any capacity in the resolution of the grievance; § 40.7(d) -Each grievance shall be answered in writing at each level of decision and review. The response shall state the reasons for the decision reached and shall include a statement that the inmate is entitled to further review....; § 40.7(e) - Responses shall be made within fixed time limits at each level of decision. Time limits may vary between institutions, but expeditious processing of grievances at each level of decision is essential to prevent grievance from becoming moot. Unless the grievant has been notified of an extension of time for a response, expiration of a time limit at any stage of the process shall entitle the grievant to move to the next stage of the process. In all instances grievances must be processed from initiation to final disposition with 180 day, inclusive of any extensions; § 40.7(f) - The grievant shall be entitled to review by a person or other entity, not under the institution's supervision or control, of the disposition of all grievances, including alleged reprisals by an employee against an inmate. A request for review shall be allowed automatically without interference by administrators or employees of the institution and such review shall be conducted without influence or interference by administrators or employees of the institution; et seq.

---

The point of this discussion is that prison officials and their lawyers have a strong incentive to try to get cases thrown out for non-exhaustion rather than have to face the merits. They also try avoiding judges that may not be sympathetic to their interpretations and position while being receptive to the prisoners' arguments. While exhaustion under § 1997e(a) is an affirmative defense, however, it is subject to equitable considerations such as tolling, estoppel, and waiver; See: Casanova v. Dubois, 2002 U.S. Dist. LEXIS 13264, No. Civ. A. 98-11277-RGS,

2002 WL 1613715 (D. Mass. July 22, 2002), 304 F.3d at 77 n.3 (1st Cir. 2002); Amador v. Andrews, 655 F.3d 89, 103 (2d Cir. 2011). In addition, § 1997e(a) requires exhaustion of only "such administrative remedies as are available." Chatham v. Adcock, 2007 WL 2904117, *14 (N.D. Ga. Sep. 28, 2007) "It would be an anomalous result, indeed, if prison officials could foreclose prison inmates from filing civil rights lawsuits in federal court simply by depriving them of the means to fulfill a mandatory prerequisite to doing so."

## Administrative Remedy Procedure Steps Taken

On September 2, 2020, Fort Dix - FCI Staff Officer J. Darden, calling himself a "Disciplinary Hearing Officer," conducted a Disciplinary Hearing where he came to a finding of guilt for the prohibited Offense Act Code 201 in Incident Report 3405562 (Exhibit D).

On or about November 5, 2020 at 13:40, Fort Dix - FCI Staff Officer, J. Boyd delivered to me the formal written DISCIPLINE HEARING OFFICER REPORT with J. Darden's findings and subsequent sanctions. I immediately went to Housing Unit 5802 Staff Alley (Staff Alley is a single, isolated wing or corridor of the Housing Unit where the Unit Team Staff - comprised of the Unit Manager, Unit Case Manager(s), Unit Counselor(s), and Unit Secretary - maintain offices and conduct Unit business), where, due to the unavailability of Housing Unit 5802 Team Counselors, I went to the only available Housing Unit 5802 Team Staff member present, Unit 5802 Team Case Manager Bradley Vogt and requested the required Administrative Remedy Appeal Form BP-10. Team Case Manager Bradley Vogt refused to provide the Form, instead, instructed me to "get that from your Counselor," and sent me away.

On November 6, 2020, I went back to Housing Unit 5802 Team Staff Alley, where, of the two (2) Unit 5802 Team Counselors that are potentially available in Unit 5802, only Unit Team Counselor Jose Cuevas was present this day. I met with Unit Team Counselor, Jose Cuevas, where I explained my effort to obtain a Regional Administrative Remedy Appeal Form BP-10 from Unit Team staff the previous day, and then requested the same Form from him. Unit Team Counselor Jose Cuevas demanded I explain what issue I needed the Form for. After explaining, Unit Team Counselor Jose Cuevas refused to provide the Form, stating, "DHO made their decision, just live with it. You've got nothing coming to you." In turn, I objected, "I am trying to appeal the issue, as I was attacked, and I need that Form." Jose Cuevas replied, "Well I'm not giving it to you. You need to learn your just an inmate at Fort Dix, you don't get what you want." He then ordered me to leave.

The Administrative Remedy Procedures, pursuant to 28 C.F.R. § 542.10, 28 C.F.R. § 40.1 - 40.22, and FBOP Fort Dix - FCI Program Statement Directive FTD 5800.16E(6)(A), have been exhausted.

- 18 -

## Exhaustion

I meet the Administrative Remedy Exhaustion requirements pursuant 42 U.S.C. § 1997e(a), 28 C.F.R. § 540.10, 28 C.F.R. § 40.1, et. seq., and FBOP Fort Dix Program Statement Directive FTD 5800.16E(6)(A), for redress in four (4) ways:

(1) On November 5, 2020, in the absence of any Housing Unit 5802 Team Counselors, I went to the only available Housing Unit 5802 Team member, Unit Team Case Manager Bradely Vogt and requested the required Administrative Remedy Appeal BP-10 Form, pursuant to 42 U.S.C. § 1997e(a), 28 C.F.R. § 542.14(d), and 28 C.F.R. § 40.1, et. seq. Unit Team Case Manger Bradley Vogt refused to issue the Form and instructed me to get the Form from other staff. This constitutes an estoppel of the Adminstrative Remedy process. "[P]risoners were not required to go to other officers where it was the [staff's] job to [issue] grievances." Crawford v. Berkebile, WL 323155 (N.D. Tex. Feb. 6, 2008); and prison officials are not to create a runaround;

(2) In order to make a sufficient and respectable effort to grieve, on the following day, November 6, 2020, I returned to Housing Unit 5802 Team Staff Alley and, as instructed, met with the only available Unit Team Counselor, Jose Cuevas, and I requested the required Administrative Remedy Appeal BP-10 Form. In turn, Unit Team Counselor Jose Cuevas demanded an explanation as to what issue required the Form. I explained my circumstance and need to Appeal. Unit Team Counselor Jose Cuevas stated, "DHO made their decision, just live with it. You've got nothing coming to you." And refused to give me the Form. This further constitutes an estoppel on many levels. First, by creating a gatekeeper scenario and screening my issue to deem whether he finds it worthy of Appeal is exhaustion. Collins v. Gourd, 438 F.Supp.2d 399, 415 (S.D.N.Y. 2006) (holding that facility personnel invented a screening procedure and did not allow him to file his grievance raised a material issue under "an exception to the PLRA's exhaustion requirement where prison authorities actively obstruct an inmate's ability to 'properly' file a prison grievance.") Cabrera v. LeVierge, 2008 WL 215720, *6 (D.N.H. Jan. 24, 2008) (Defendant's reliance upon undisclosed rules to reject plaintiff's grievance form necessarily estops them from relying upon plaintiff's failure to exhaust those remedies as a defense." Second, after screening to determine the merit of my issue and to tell me, "DHO made their decision, just live with it. You've got nothing coming to you." and then refusing to provide the required Administrative Remedy Appeal BP-10 Form make the Administrative Remedy Process unavailable. Tinsley v.

- 19 -

Giorla, 2008 WL 901697, *5 (E.D. Pa. Apr. 1, 2008) (if a prison official told a prisoner a decision could not be appealed, contrary to written grievance policy, the grievance procedure could be found unavailable); Pacheco v. Drown, 2010 WL 144400, *21 (N.D.N.Y. Jan. 11, 2010) (citing erroneous ruling that plaintiff's grievance was non-grievable). Third, after I explained to Unit Team Counselor Jose Cuevas that, "I am trying to appeal the issue, I was attacked, and I need that Form." and for Unit Team Counselor Jose Cuevas to reply, "Well I'm not giving it to you. You need to learn your just an inmate at Fort Dix, you don't get what you want." This refusing me the required Form and ordering me to leave made the Administrative Remedy Procedure unavailable. Blout v. Fleming, 2006 WL 1805853. *2-4 (W.D. Va. June 29, 2006) (stating "when prison officials prevent an inmate from access to or use of a prison inmate's grievance system, an inmates failure to exhaust is excused because he had no 'available' administrative remedy"); If prison officials make administrative remedy unavailable by misconduct, mistake, or inaction, the exhaustion requirement is obviated. See: Kaba v. Stepp, 458 F.3d 678, 684-85 (7th Cir. 2005). In particular, remedies are not available if prison officials fail to respond to a properly filed form or refuse to provide forms to an inmate who requests them ("[W]hen prison officials fail to provide inmates with the forms necessary to file an administrative grievance, administrative remedies are not 'available'"); Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008) ([A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."); Russo v. Honen, 755 F.Supp.2d 313, 315 (D. Mass. 2010) (failure to provide grievance form makes remedy unavailable); Miller v. Norris, 247 F.3d 736, 2001 U.S. App. LEXIS 6209 No. 00-1053 (Jan. 8, 2001) (The Court "determined that appellant was only required the administrative remedies available to him prior to bringing suit"); Liggins v. Barnett, 2001 U.S. Dist. LEXIS 25767 No. 4:00-cv-90080 (May 15, 2001) (quoting Miller v. Norris) (holding that prison officials' failure to provide grievance form raised inference that plaintiff exhausted administrative remedies).

(3) I have been deprived of Constitutional Rights and suffer continued irreparable injury. Davis v. Milwaukee County, 255 F.Supp.2d 967, 975-76 (E.D. Wis. 2020), the court held that the plaintiff had been denied access to the courts by defendants' hindering his ability to exhaust, inter alia, by failing to make available materials [forms] concerning the grievance procedure. Free the Nipple v. City of Fort Collins, 2019 U.S. App. LEXIS 4596. No. 17-1103 (10th Cir. Feb. 15, 2019), "[A] deprivation of any constitutional right was irreparable injury." and the

public always has an interest in preserving Constitutional Rights. "Exhaustion may be excused where it would be futile, if the actions of the agency clearly and unambiguously violate statutory or Constitutional Rights, or if the administrative procedure is clearly shown to be inadequate to prevent irreparable injury." See also Lyons v. U.S. Marshals, 840 F.3d 202, 205 (3d Cir. 1998); Carling v. Peters, No. 00-2958, 2000 U.S. Dist. LEXIS 10288, 2000 WL 102295 at *2 (E.D. Pa. Jul. 10, 2000) (exhaustion not required where delay would subject Petitioner to "irreparable injury.").

(4) Petitioner is not required to exhaust the Administrative Remedies pursuant to PLRA as it does not apply to 28 U.S.C. § 2241 petitions, Carmona v. U.S. Bureau of Prisons, 243 F.3d 629, 634 (2d Cir. 2001) stating (that the PLRA does not apply to disciplinary proceedings. Skinner v. Wiley, 355 F.3d 1293 (11th Cir. 2004); Walker v. O'Brien, 216 F.3d 626, 633-36 (7th Cir. 2000), holding ([t]he requirement of the Prison Litigation Reform Act do not apply to habeas corpus actions, whether they are brought under 28 U.S.C. § 2241, 2254, or 2255, because those actions are not civil actions within the meaning of PLRA). See also Blair-Bey v. Quick, 151 F.3d 1036, 331 U.S. App. D.C. 362 (D.C. Cir. 1998); Davis v. Fechtel, 150 F.3d 486 (5th Cir. 1998); McIntosh v. U.S. Parole Commission, 115 F.3d 809 (10th Cir. 1997).

I have exhausted the Administrative Remedy procedure pursuant 42 U.S.C. § 1997e(a), 28 C.F.R. § 542.10, 28 C.F.R. § 40.1, et, seq., and FBOP Fort Dix - FCI Program Statement Directive FTD 5800.16E(6)(A), for a redress of the unilateral finding of guilt by the Fort Dix - FCI Staff Officer, J. Darden, in the proffered title of "Disciplinary Hearing Officer" acting as a Judge in the State of New Jersey, for Incident Report number 3405562 (Exhibit C) and the imposed sanctions, to include the loss of Good Time Credits, thereby extending the United States District Court imposed term of incarceration, as best practicable, and now timely bring this matter to this Honorable Court.

## IX. ACTUAL INJURY/LOSS - CAUSE & CONTROVERSY

It has been made true and widely accepted that prisoners retain their Constitutional Rights while incarcerated. Because, a prisoner takes the Constitution into the prison with him, Marbury v. Madison, (1803), "no provision of the Constitution was meant to be without effect." Free the Nipple v. City of Fort Collins, 2019 U.S. App. LEXIS 4596, No. 17-1103 (10th Cir. Feb. 15, 2019) Therefore, "a deprivation of any constitutional Right ⌊is⌋ irreparable injury."

The 1995 decision in Sandin v. Connor, modified the meaning of "liberty" for prisoners, discouraged states from codifying their rules and led to greater federal court intervention in day-to-day prison management. Sandin v. Connor, 515 U.S. 472, 132 L.Ed 2d 418, 115 S.Ct. 2293. In Sandin, the Court said prisoners should only be found to have liberty interests in three circumstances:

(1) when the right at issue is independently protected by the Constitution;
(2) when the challenged action causes the prisoner to spend more time in prison, or
(3) when the action imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. In short, courts intervene in the correctional administrative process under three (3) circumstances:
   (1) The statute or policy under which the prison administrator is acting is unconstitutional or unconscionable;
   (2) The act of the prison administrator is outside the scope of his authority, or ultra vires; or
   (3) The procedure used by the prison administrator in decisions affecting the status of a prisoner falls below minimum of Due Process.

No part of this Memorandum, the associated Writ, or any other related documentation should be adjudicated under the Administrative Procedures Act (APA). Any reference made thereto is strictly for clarification purposes. The claims, as outlined below, should be considered as violations of the Counstitution of the United States, well-established Supreme Court precedent, case law, and Federal Bureau of Prisons policies.

I have been deprived of:
· 27 Days of Earned Good Conduct Time, resulting in my spending more time prison;
· My Liberty Interest by being confined in the Sensory Deprivation and Isolation

Unit (aka: SHU), which created an atypical and significant hardship;

- My Liberty Interest and Equal Protection to be housed along with the general prisoner population was infringed upon by depriving me of the ability to work, earn income from payroll, participate in educational and vocational classes, rehabilitative programs, college courses, engage in recreational activities, maintain personal hygiene (such as bathing), and socialize with others all day.

- The Fourteenth (14th) and Fifth (5th) Amendment Rights to Due Process;

- The First (1st) Amendment Right of Access to the Courts to redress a grievance;

- The Second (2nd) Amendment Right to self-defense;

- The Eighth (8th) Amendment Right to be free from Cruel and Unusual Punishment;

- The Eleventh (11th) Amendment Right to Equal Protection of Law.

These Rights have been despised and violated by the Defendants:

- Refusal to provide the Forms required by law for Access to the Courts - a First (1st) Amendment claim;

- Refusal by the investigative and adjudicating body to consider exculpatory evidence, that of a self-defense - a Fourteenth (14th), Fifth (5th) and Second (2nd) Amendments claim, creating a Brady violation;

- Failure to keep me free from Personal Injury - an Eighth (8th) Amendment claim;

- Refusal, by the adjudicating body, to exercise my Right to call Witnesses - a Fourteenth (14th) and Fifth (5th) Amendments claim;

- Adjudicating in a Disciplinary Hearing in a Court/Hearing of No Authority - a Fourteenth (14th) and Fifth (5th) Amendments Due Process claim;

- Disallowance of 27 days of Earned Good Conduct Time, a Fourteenth (14th) and Fifth (5th) Amendment Due Process claim, and an Eighth (8th) Amendment Cruel and Unusual Punishment claim;

- Failure to provide and maintain Security Devices - an Eighth (8th) Amendment Cruel and Unusual Punishment claim;

- Forced exposure to a known Mentally Ill inmate - an Eighth (8th) Amendment Cruel and Unusual Punishment claim, and Equal Protections violation by not housing me with like prisoners;

- Negligence to properly train and ensure facility staff properly investigate all

    situations, including those that may result in an outcome that is unfavorable to
the facility - a Fourteenth (14th) and Fifth (5th) Amendments Due Process claim;

· Entering into the facility Record inaccurate information - a Fourteenth (14th)
and Fifth (5th) Amendments Due Process claim, and an Eleventh (11th) Amendment
Equal Protection claim and fraud!;

· Designation of a Badge of Infamy on me, namely that of being a "violent"
offender, a Fourteenth (14th) and Fifth (5th) Amendments Due Process claim, and
an Eleventh (11th) Amendment Equal Protection claim and fraud!

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CAMDEN DIVISION

Jeremiah J. Salamon, In Propria Persona,
v.
Stevie Knight, Warden/C.E.O. of Fort Dix - FCI

Memorandum of Law in Support of 28 U.S.C. §§§ 2241, 2242 & 2243
by a Person in Federal Custody
in Appeal of Fort Dix Disciplinary Hearing Officer's Decision

## GROUND ONE

On May 27, 2020, after being assaulted by another inmate, I was interviewed by Special Investigation Section (SIS) Lieutenant M. Fernandez, and then taken to the Sensory Depravation and Isolation Unit (or sanitized term: Special Housing Unit or SHU). On June 8, 2020, while still held in the Sensory Depravation and Isolation Unit, Lieutenant J. Marcucci delivered to me an Incident Report (Exhibit A). I immediately noticed a number of inaccuracies and discrepancies therein in Section 11. "Description of Incident". From the first sentence, the SIS Lieutenant M. Fernandez states, "...into a fight between..." and "Rockey and Salamon were engaged in a mutually conbative physical altercation." Obviously, the SIS Lieutenant decided from the outset that this incident was a "fight" that was "mutual", without conducting an investigation. Then, a few sentences further he writes, "Salamon stated he then stood up and struck Rockey in the face with a closed fist." This statement is entirely false. I never stated, claimed or confessed to hitting Rockey in any manner. To clarify, I never hit, punched, or assaulted Rocket, therefore, I would have no reason to confess to such. What I did inform SIS Lieutenant M. Fernandez of was that Rockey hit me in the face with his fist in addition to swinging his cane, which also hit me, along with the rest of the statement as set out in the "Statement of Facts from J. Salamon" (Exhibit F). Furthermore, I notified Lieutenant M. Fernandez that Edward Leon, among others, were in the room and witnessed Rockey attack me and that I only reacted in self-defense. After notifying Lieutenant J. Marcucci of these inaccuracies, he informed me that someone would meet with me before the Disciplinary Hearing to make any corrections.

On June 12, 2020, I met with Housing Unit Counselor J. Cuevas where he took my verbal and written statement (Exhibit F) - ostensibly - to correct the errors in the Incident Report (Exhibit A).

On September 2, 2020, Staff Officer J. Darden conducted a Disciplinary Hearing where he found me guilty of the prohibited act. He states, "The DHO based this finding upon the reporting officer's written statement[.] The investigation concluded, based on eye-witness accounts, and the statements provided by both inmate Rockey and Salamon, inmates Rockey and Salamon were engaged in a mutually combative altercation...." He then goes on to repeat, verbatim, the statement from the Incident Report in Section 11 as **incorrect**ly entered by SIS Lieutenant M. Fernandez.

Although the Bureau of Prisons and Fort Dix - FCI do not respect or acknowledge the Administrative Procedures Act, their Administrative Process is modeled on it. The Bureau of Prisons is an "agency" within the definition of Administrative Procedures, and its rule making is subject to applicable requirements of the Administrative Procedures Act. "[W]e recognize in the context of this case that the Bureau of Prisons is, indeed, an "agency" within the definition of the Administrative Procedure Act, 5 U.S.C. § 551, and that its rule making is subject to applicable requirements of that Act." Ramer v. Saxbe, 552 F.2d 695, 173 U.S. App. D.C. 83 (D.C. Cir. 1975); "The United States Bureau of Prisons is an agency within the meaning of the Administrative Procedure Act." Simmat v. United States Bureau of Prisons, 413 F.3d 1225 (10th Cir. 2005).

Pursuant to U.S.C.S. § 552a, a "cause of action where a claimant can demonstrate (1) the information [at least] is covered under the Act as a 'record' contained in a 'system of records;' (2) the agency 'disclosed the information;' (3) the disclosure had an 'adverse effect' on the Plaintiff; and (4) the disclosure was willful or intentional." It also "requires agencies to ensure that any record used in making any determination about any individual are maintained with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." And "to entertain requests for amendment of records that are not accurate, relevant, timely or complete. If an agency rejects a request for amendment, the subject of the contested can 'bring suit in federal court and obtain de novo consideration whether the amendment is warranted.'" 5 U.S.C.S. § 552a(g)(1)(A)(2)(A). If the Court so finds, it may order the agency to amend the individuals records. 5 U.S.C.S. § 552a(g)(2)(A)." Skinner v. United States Department of Justice and Bureau of Prisons, No. 05-5284, 584 F.3d 1093, 338 U.S. App. D.C. 261, 2009 U.S. App. LEXIS 23611 (Oct. 27, 2009). Clearly the Incident Report is a matter of "Record" contained in a "system of records," and the information contained therein was disclosed and relied upon to find guilt and

- 26 -

met out sanctions. A prisoner is deprived of procedural due process at a
disciplinary hearing in which "the hearing officer merely accept[s] conclusions of
the investigating officer...." Broussard v. Johnson, 918 F.Supp. 1040 (E.D. Tex.
1996), sub. app., 253 F.ed 874 (5th Cir. 2001); See also Hensley v. Wilson, 850
F.2d 269, 277-78, 282-83 (6th Cir. 1988) (reliability not established because
disciplinary committee accepted investigative officer's conclusions rather than
making independent determination....).

It has been said that truth is an absolute defense. The general standard is
that information must be substantially true. "The due process requirement for
prison disciplinary proceedings are not so lax as to let stand the decision of a
biased hearing officer who dishonestly suppresses evidence of innocence." Skinner
v. United States Department of Justice and Bureau of Prisons, No. 05-5284, 584 F.3d
1093, 338 U.S. App. D.C. 261, 2009 U.S. App. LEXIS 23611 (Oct. 27, 2009).
Unfortunately, most of the details of modern Disciplinary Hearings are based not on
legal precedent but on bureaucratic choice and tradition - upholding the "status
quo." They are not going to conduct some judicious balance test. The Disciplinary
Hearing Officer believes themself to be both an arm of law enforcement and an
extension of the Judiciary. They are not there to help just as a cop is not there
to cancel a speeding ticket he gave you. Because the Bureau of Prisons, and by
extension, Fort Dix - FCI administration, is a bureaucracy, they believe they can
get away with unconstitutional, unlawful and arbitrary treatment of prisoners.
Oftentimes they do so because the system of accountability has little to no
accountability, and it promotes and commends irresponsibility. Unsurprisingly,
there has been a great deal of litigation as a consequence of the Bureau of
Prison's choices extend to some still unresolved problems.

"It has always been true that a person may not be punished by government
without due process of law." Pletka v. Nix, 957 F.2d 1480 (8th Cir. 1992). Although
Due Process tolerates variances in procedure "appropriate to the nature of the
case." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950) it is
nonetheless possible to identify its core goals and requirements. First,
"[p]rocedural due process rules are meant to protect persons not from the
deprivation, but from the mistaken or unjustified deprivation of life, liberty, or
property." Carey v. Piphus, 435 U.S. 247, 259 (1978). "[P]rocedural due process
rules are shaped by the risk of error inherent in the truth-finding process as
applied to the generality of cases." Mathews v. Eldridge, 424 U.S. 319, 344 (1976).
Thus, the required elements of Due Process are those that "minimize substantively

unfair or mistaken deprivations" by enabling the persons to contest the basis upon which a state propose to deprive them of protected interests. Fuentes v. Shevin, 407 U.S. 67, 81 (1972). At times, the Court has also stressed the dignitary importance of procedural rights, the worth of being able to defend one's interests. Carey v. Piphus, supra.; See Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980); See also Nelson v. Adams, 529 U.S. 460 (2000). The core requirements are notice and a hearing before an impartial tribunal, for discovery, the presenting of witnesses and written witness statements, and that a decision be made based on the accurate record.

It is obvious that the misrepresentations and lies expressed by the SIS lieutenant in the Incident Report (Exhibit A) and the actions taken by the Bureau of Prisons were neither accidental, or mistakes, but deliberate, "willful and intentional." The BOP was given ample opportunity on three (3) occasions to correct or amend the record: On May 27, 2020, Lieutenant J. Marcucci; on June 12, 2020, Housing Unit 5802 Counselor Jose Cuevas; and on September 2, 2020, Staff Officer J. Darden, all had a chance to do so, but declined. In sum, the SIS Lieutenant drafted an inaccurate record, Unit 5802 Counselor Jose Cuevas had the power to correct the record but did not, and Staff Officer J. Darden relied upon the false record, while refusing the admission of opposing eye-witness' accounts to correct the record, proclaimed guilt and include the disallowance of Good Conduct Time. Denny v. Schultz, 708 F.3d 140, 143 (3d Cir. 2013) ([Defendant has a] liberty interest in good time credit created by federal statute).

Punishment always implicate a liberty interest because the requirement of guilt is a substantive limit of official discretion. Gilbert v. Frazier, 931 F.2d 1581, 1582 (7th Cir. 1991). To better understand how inadequate the Bureau of Prisons (BOP) and its Warden's discretion is, one only need to look as far as their handling of the Coronavirus and the discretionary decisions the BOP has made during this pandemic. According to Senate Judiciary Committee Chair, Senator Richard Durbin, D-Illinois, of the nearly 31,000 inmates that requested Compassionate Release during the pandemic, the BOP approved only thirty-six (36), fewer requests than it approved before the pandemic. (Senate Committee on the Judiciary, Executive Business Meeting (May 27, 2021)). This abuse of discretion, or blatant negligence, has led to over 50,000 federal prisoners testing positive, some twice with reinfection, and more than 300 inmate deaths related to COVID-19. More than forty (40) of those inmates who died did so while waiting for the BOP to rule on their requests. In sum, as a result of the BOP's discretion and incompetent decision-

- 28 -

making, more prisoners have lost their lives in the negligent custody of the BOP than have been allowed to go to the infection-free safety of their own homes. The fact that this example has to do with Compassionate Release should be of no comfort, as this lack of appropriate or reasonable decision-making is emblematic of all things BOP. Although the BOP always indicates they are doing everything right, correct and honorable, and the prisoner is doing everything wrong; the reality is, the BOP, facility administration, and Staff Officers can create all the policies, protocols and reports they want, that does not mean any of those things are getting done or are true. The vast majority of the time they are not. Officials generate paperwork to give the illusion of care and competency, while doing little, and more often nothing, to effectuate any meaningful change or benefit. More to the point, Staff make decisions that require the least amount of work on their behalf or that causes the greatest negative outcome for the prisoner. The BOP and each individual facility administration and employees are only interested in one thing, and that is bigger budgets. Their funding is based on how many inmates are held in confinement. The longer they are held directly correlates to larger coffers, more overtime, and more - nepotistically fulfilled - jobs. They have no interest nor incentive to help inmates or prevent injustices. Their incentive is to effectually avert responsibility to maintain employment, gain overtime and earn bonuses. When a prisoner, as a result of a fraudulent or real incident and arbitrary finding of guilt, is disallowed Good Conduct Time days off their sentences, or the sentence is lengthened for some other reason, this feeds into exactly what the BOP and facility Staff want. Over and over again, BOP administrators and local facility Staff make wrong, unethical, and immoral choices; obviously their decision-making cannot be relied upon and the Court must weight in on this matter.

The Fifth Amendment to the Constitution of the United States restrains the Federal Government, and Section 1 of the Fourteeth Amendment restrains the States, from depriving any person of life, liberty, or property without Due Process of law. The Due Process Clauses are designed to protect the individual against biased and arbitrary government action. More specifically, Due Process Clauses prohibit government from infringing on prisoners liberty interests without Due Process of law. Wolff v. McDonnell, 418 U.S. 539, 558 (1974) (Due Process protectiions require adequate and accurate management of evidence that is accessible to prisoner for the purpose of demonstrating prisoner is not guilty). Newton v. City of New York, 779 F3.d 140, 151 (2d Cir. 2015) (Due process protections require prisoners not be subjected to "arbitrary deprivations of 'liberty'" despite prison officials' interest in discretion and flexibility). In the instant matter, Fort Dix - FCI

Staff willfully and intentionally provided false records, repeatedly refused to correct the records, relied upon these inaccurate records, actively deprived me of Due Process and Equal Protection of Law, disciplined me unfairly for allegedly fighting, and disallowed Good Conduct Time in violation of the Eight Amendment. Bridgham v. Astrue, Civ. No. 07-81, 2008 U.S. Dist. LEXIS 3311, 2008 WL 1803619, at *10 (E.D.N.C. Apr. 21, 2008) Case remanded because "it is not clear what extent ALS relied in this [incorrect] record to make his decision."

While Section VIII of this Petition and "Exhibit F" details the physical assault in this matter, what is absent, yet relevant, is my cognitive and emotional state during the incident.

- 30 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

Jeremiah J. Salamon, In Propria Persona,
        v.
Stevie Knight, Warden/C.E.O. of Fort Dix - FCI

Memorandum of Law in Support of 28 U.S.C. §§§ 2241, 2242 & 2243
by a Person in Federal Custody
in Appeal of Fort Dix Disciplinary Hearing Officer's Decision

## GROUND TWO

On the morning of May 27, 2020, the regular 7:30am time to go to work was delayed, and at approximately 8:00am I sought out Edward Leon, the Senior Floor Coordinator, thinking he may know something about the delay and the possibility of working overtime later that day. Once I located Leon in the television room, I sat next to him and initiated a conversation with him. When Rockey interrupted us, I thought Rockey was just being his typical - pain in the ass - self. I knew from reputation and observation that Rockey was an aggravator, one who enjoyed creating problems for no apparent reason; which I attributed to mental illness. Unwilling to get hooked into his drama, I was dismissive of Rockey and continued my conversation with Leon. The second time Rockey interrupted, I dissembled Rockey's assertion and again resumed the conversation with Leon. I am a fairly calm and level-headed person, and one that made a promise not only to myself but also my family to not do anything that would put my health or date of release in jeopardy. In the moment, I began to feel tension and intimidation. I was being antagonized by a much larger man, well over six (6) feet tall, armed with a weapon - a cane - in an aggressive manner. However, I maintained a claim and rational demeanor, thinking that Rockey would respond in kind. I even informed him that an incident was not going to end the way he wanted it to. Although I had no way of knowing what he was thinking or what his overall goal was, I believed that the aftermath of an argument or altercation was not it. I knew such could include: a period of time in the sensory deprivation and isolation unit; an incident report; transfer from the facility; loss of good time; personal injury; loss of property; and more. Unfortunately, Rockey did not calm down. Instead, he started to physically assault me by punching me in the face. I immediately felt fearful. Afraid I was going to get injured - or worse - considering he was armed with a weapon. This amount of fear was elevated further once I realized I was trapped between the assailant and an immovable

- 31 -

concrete bench. I knew I needed to protect myself and get away from the attacker. As a natural response to being hit in the face, I put my left hand up to the left side of my head to block forthcoming hits, and braced my right arm across my chest. I didn't have but a split second to think about it, but I figured maneuvering myself past Rockey would provide an opportunity to get away from him. Almost immediately after I pushed into Rockey to move past him, he fell backwards over the concrete bench behind him. Being of larger stature, he fell to the ground fast and hard. Seeing this caused me to feel concern for his well-being. At that point I went over to Rockey and asked him if he was alright. I also hoped the abruptness of his fall and the circumstance of now being on the ground would cause him to realize the precarious position he was in and the poor decision he had made, which would result in his calming down. Admittedly, the thought of hitting or kicking him crossed my mind, and despite having ample opportunity, I figured if he discontinued his attack and relaxed, there was no need to retaliate or seek reprisal. Moreover, I am not a violent person, I prefer to forgive and forget. When Rockey proceeded to get back up and I noticed the blood dripping from his head, I continued to feel concern, but also compassion. He had already hurt himself enough, if I were to react, it would be like kicking a wounded animal. To my surprise, Rockey pursued me again. Again I felt fear, realizing I really needed to get away from him, although he was blocking the doorway, but I figured I could find a way to get out. I managed to push my way past Rockey and headed toward the door, but Rockey quickly regained his balance and raised his cane above his head and came after me. I knew I could not turn away as he would just hit me in the back of the head with it. I maintained eye contact with Rockey as I attempted to back out the doorway, but Rockey still swung the cane at my head. I was able to deflect the attack with my left arm and then seized the opportunity to leave the television room. At that point I was still scared, thinking I had injuries, while also experiencing an asthma attack. I went to the bathroom to check myself for wounds, finding a red mark above my eye and a welt on my arm; nothing significant. I then went to my room where I laid down and relaxed in order to get my breathing under control. I eventually calmed and the respiratory distress subsided in time to go to work shortly thereafter. Being that the attack did not result in substantial personal injury, I did not believe there was reason to report to the Medical Department, but I was not sure that Rockey would not need to have his injury looked at. At work, again I sought out Leon where I asked him, if necessary, would be a witness; to which he agreed. Overall, I felt confident that my evasive maneuvers were only in

self-defense.

Hours later I was interviewed by Special Investigation Section (SIS) Lieutenant M. Fernandez, and then taken to the Sensory Depravation and Isolation Unit (or sanitzed term: Special Housing Unit or SHU). On June 8, 2020, while still held in the Sensory Depravation and Isolation Unit, a Lieutenant J. Marcucci delivered to me an "Incident Report" (Exhbit A). I immediately noticed a number of inaccuracies and discrepancies in "Section 11. Description of Incident." From the first sentence, the SIS Lieutenant M. Fernandez states, "...into a fight between..." and "Rockey and Salamon were engaged in a mutually combative physical altercation." It is obvious the SIS Lieutenant decided from the outset that this incident was a "fight" that was "mutual," without conducting an investigation. Then a few sentences further he writes, "Salamon stated he then stood up and struck Rockey in the face with a closed fist." This statement is entirely false, a lie! I never stated, claimed or confessed to hitting Rockey, therefore, I would have no reason to confess to such. What I informed SIS Lieutenant M. Fernedez of is: That Rockey punched me in the face with his fist and also swung his cane and hit me, along with the rest of the statement as set out in my "Statement of Facts from J. Salamon" (Exhibit F). Additionally, use of the term "closed fist" is not a phrase I would ever say, nor do I believe such rhetoric or nomenclature is used by anyone but an overzealous, armchair detective. It is just not a normal or typical phrase, one would simple say, "was hit with a fist" not a "'closed' fist." Lastly, after viewing the wounds sustained by me, SIS Lieutenant M. Fernandez prolaimed that they were "defensive wounds." I also notified SIS Lieutenant M. Fernandez that Edward Leon, among others, were in the room and witnessed Rockey attack me and that I only reacted in self-defense.[1]

Self-defense is an affirmative defense. In the United States legal system, each State allows a defendant to claim self-defense when accussed of a violent offense, as does the federal government.

Individual self-defense is the central component of the Second Amendment Right. According to the Supreme Court, in District of Colombia v. Heller, the Second Amendment serves three purposes: protecting militias, hunting, and self-defense. 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). While also noting that self-defense is "the central component of the right." 554 U.S. at 599

---

[1] Pursuant to Bureau of Prisons Program Statement Directive 5270.09 (2)(b)(2) Investigation. "...the inmate's statement, offering a rationale for his/her conduct or for the charges against him/her should be investigated."

(emphasis in original); See also <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 130 S.Ct. 3020, 304, 177 L.Ed.2d 894 (2010). Although this is regarding the matter of firearms in self-defense defense, it must reasonably stand that a less lethal self-defense alternative without a firearm is lawful. Citizens must be permitted to defend themselves against harm. <u>Eastern Paralyzed Veterans Association, Inc. v. Secretary of Veterans Affairs</u>, No. 00-7036, 257 F.3d 1352 2001 U.S. App. LEXIS 16016 (Jul. 19, 2019) Internal agency regulations cannot be unconstitutional or violate statutory rights.

In ordinary parlance, "self-defense" is defined as: "n. The use of force to protect oneself, one's family, or one's property from a real or threatened attack. Generally, a person is justified in using a reasonable amount of force in self-defense if he or she reasonably believes that the danger of bodily harm is imminent and that force is necessary to avoid this danger." Self-defense, Black's Law Dictionary (10th Ed. 2014); See also: Self-defense, Oxford American Dictionary (2d Ed. 2008) ("the defending of oneself or one's interests, especially through the use of physical force, which is permitted in certain cases as an answer to a charge of violent crime."). In other words, "self-defense" is the justified use of reasonable physical force upon another person to defend themselves or a third party from what they reasonably believe to be the use of imminent physical force against themselves or another, and they may use such degree of force which they believe to be necessary.

To succesfully claim self-defense, the defendant must prove four elements. First, the defendant must prove that he or she was confronted with an unprovoked attack (i.e., who started the incident). Second, the defendant must prove that the threat of injury or death was imminent. Third, the defendant must prove that they had an objective and subjective reasonable fear that they were going to be injured or killed unless they used self-defense. And, fourth, the defendant must prove that the degree of force used in self-defense was objectively reasonable under the circumstances.

Courts and tribunals have historically accepted self-defense as a defense to a legal action. As a matter of public policy, the physical force or violence associated with self-defense is considered an acceptable response to aggression. The basic issues in any self-defense claim, and the most important evidence to present in support of, is that of showing who started the incident or that the

- 34 -

defendant did not start the incident. In this instant matter, as provided in Section VIII of this Petition, in the "Statement of Facts from J. Salamon" (Exhibit F), and the sworn Affidavit eye-witness accounts (Exhibits G,H and I) all indicate that Rockey was the instigator and aggressor that started the assault upon me.

A defendant cannot use any degree of force in self-defense unless the defendant is faced with an imminent attack. State v. Taylor, (2010). Imminent means the attack is immediate and not something that will occur in the future. If the defendant is threatened with a future attack, the appropriate response is to inform law enforcement so that thay can incapacitate the threatening individual by arrest. "Attack" is defined as: "n. an act of attacking someone or something; v. to take violent action against someone or something." attack, Oxford American Dictionary (2d Ed. 2008). And deadly force is defined as any force that could potentially kill. An individual does not have to actually die for the force to be considered deadly. Examples of deadly force are the use of a weapon (i.e., knife, gun, cane, vehicle) or even bare hands when there is a disparity in size between two individuals. In the instant case, as provided in Section VIII of this Petition, in the "Statement of Facts from J. Salamon" (Exhibit F), and the sworn Affidavit eye-witness accounts (Exhibits G,H and I) this element is more than satisified for my claim of self-defense because Rockey did not merely threaten bodily harm, but actually attacked me. Furthermore, the attack included the use of a potentially deadly weapon, a cane. Also noteworthy, the assailant is much larger, at over six feet (6') tall, versus my being only five-foot seven-inches (5'-7") tall.

Self-defense is a defense based on justification that allows a defendant to use physical force to protect himself or herself from injury or death. In deciding whether or not a defendant "reasonably believed" that physical force was necessary, a finder of fact must apply two tests. "Resonable belief" in the context of self-defense has subjective and objective aspects. The first test is the subjective one, and that is: did this defendant, not some other person, in fact believe that physical force was necessary to prevent the imminent use of potentially deadly physical force. It is based or influenced by an individual's perceptions, feelings, or intentions, as opposed to externally verifiable phenomena. If we asked a random sample of lay people, "what is your primary emotion when you need to use violence in self-defense or defense of others?" Most would identify the correct answer as "fear." We all know about the fear response, commonly known as fight, flight or freeze. If we believe that someone or something threatens our safety or our lives, we naturally feel afraid and must protect ourselves or others. The second test is

the objective one, which is based on externally verifiable phenomena, as opposed to an individuals feelings, intentions, opinions or bias. What matters is whether a "reasonable person" in the same situation would have perceived an immediate threat of physical harm. The concept of the "reasonable person" is a legal conceit that is subject to differing interpretations in practice, that require some degree of due diligence, but it is the best means to determine whether a person's preception of imminent danger is justified in the use of protective force. In other words, it asks whether a reasonable and prudent person would have deemed the threat to real.

With all understanding and agreeing that self-defense is permissible, justified under the reasonable beliefs of the subjective and objective prongs, and when that standard is applied to the instant case, both prongs are satisified. My being attacked by the assailant and my reasonable feeling of fear of harm, to the point of invoking an asthma attack, clearly satisfies the subjective prong. And a reasonable person, similarity situated, would most certainly not allow themselves to remain trapped between an immovable object and an attacker, especially one armed with a potentially deadly weapon, and sit back and get attacked without defending themselves. As such, this satisfies the objective prong. Therefore, I was justified in using self-defense because the imminent harm was actual and real, and my fear was palpable in the existence of personal harm.

In self-defense or defense of others, there must be a reasonable belief that the degree of force they are using to defend themselves or a third party is necessary under the circumstances. However, it also requires that the belief of a person be reasonable and not irrational under the circumstances. Would a reasonable person in the defendant's circumstance come to the same conclusion? Self-defense also requires the response to match the level of the threat in question. A person may repel force by force in defense of their person, property or habitation, against any one who manifests, intends, attempts, or endeavors, by violence or surprise, to commit a forcible felony, such as assault, murder, robbery, rape, arson, burglary, and the like. In these cases, one is not required to retreat, but may resist and even pursue the adversary, until they have secured themselves from all danger. Generally, a defendant can use a "reasonable" amount of force in self-defense. What is reasonable depends on the circumstances. The most important factor is how much force the victim is using. Self-defense must also be proportionate to the threat of harm. Typically known as an "eye-for-an-eye." This is a complete defense.

In the instant case, I was attacked by a larger person, who did not merely threaten bodily harm upon me, but physically attacked me. An attack that was coupled with the use of a potentially deadly weapon - a cane. My being trapped between the assailant and an immovable concerte bench, in duress, I merely pushed my body past the attacker. In the balance of equities, repeated fists to my face and the use of a weapon weigh far more heavily in the likelihood of causing serious and potentially permanent harm than the simple pushing of ones body into another. Commonwealth v. Witherspoon, 1999 PA Super 80, 730 A.2d 496 (Pa. Super. Ct. 1999) (a defendant is not guitly of simple assault when he acted in self-defense: defined as non-excessive force necessary for the purpose of protection).

Original laws regarding self-defense required the person claiming self-defense to first make an attempt to avoid the violence before using force, although most States have removed this rule for instances involving the use of non-lethal force. This is known as a "duty to retreat." Considering the fact that when someone puts us in danger, we have a "fight/flight/freeze" response, and one third of the time, retreat is a natural response. In duress, as previously stated above, in Section VIII of this Petition and the "Statement of Fact from J. Salamon" (Exhibit F), I was trapped between the assailant and an immovable concrete bench. My first reaction was to ecsape or retreat, but I was not able to do so. United States v. Moreno, 102 F.2d 994 (9th Cir. 1996) Duress defense has three elements: (1) immediate threat of serious bodily injury or death; (2) well-grounded belief (fear) that threat will be carried out; and (3) no reasonable opportunity to escape or otherwise to frustrate threat. Therefore, I was left with no option but to defend myself.

It is also important to point out that the history of an individual may bare significant weight during the investigation process. In this instance case, if the investigator had conducted a through investigation, it would have revealed that Rockey was prone to violence. He has been involved in at least two other fights while incarcerated, one of which he also used a cane in the assault. This shows an aggressive character with a propensity for violence. On the other hand, I do not have any history of violence, either prior to confinement or during, nor have I been in any physical altercations.

In conclusion, all four elements to justify my claim of self-defense have been proven and provided. The law respects the passions of the humanmind, and makes it lawful in them, when external violence is offered to defend themself, or those to

whom they bear so near a connection, to do that immediate justice to which they are prompted by nature and which no prudential motives are strong enough to restrain. The Self-Defense Clause of the Second Amendment and established case law, recognize Self-defense as an affirmative defense. Self-defense is a justification "if a man reasonably believes that he is imminent danger of death or grievous bodily harm from his assailant." Brown v. United States, 256 U.S. 335, 343 41 S.Ct. 501. 65 L.Ed. 961 (1921). "The law of self-defense, as it is applied by the courts, turns on two requirements: the force must have been necessary, and it must have been reasonable." Andrew Ashworth, Principles of Criminal Law 114 (1991). In the instant matter, the Defendant violated my Constitutional Right to act in self-defense by failing to acknowledge my resonse as such, and investigating the incident in light of this defense, when there was easily obtainable evidence to corroborate the Self-defense defense. Thornley v. Edwards, Civil No. 86-1503, 671 F.Supp. 339, 1987 U.S. Dist. LEXIS 9469 (3d Cir. 1987) Federal agency regulations cannot diminish Constitutional right. See also: In re Nautilus Motor Tanker Co., 86 F.3d 105, 1996 A.M.C. 2308, 44 Fed.R.Evid. Serv. (CBC) 667 (3d Cir. 1996). When a defendant raises a defense and offers some evidence that he was acting in self-defense or defense of another the generic term is called justification. It applies to self-defense and defense of another. A justification means that even though a person carried out an ordinarily prohibited act, he was right to do it and therefore deserves no condemnation in the form of conviction or punishment. And I was justified in acting in self-defense.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

Jeremiah J. Salamon, In Propria Persona,
    v.
Stevie Knight, Warden/C.E.O. of Fort Dix - FCI

Memorandum of Law in Support of 28 U.S.C. §§§ 2241, 2242 & 2243
by a Person in Federal Custody
in Appeal of Fort Dix Disciplinary Hearing Officer's Decision

### GROUND THREE

On May 27, 2021, I was viciously and without cause attacked by another inmate, "Rockey," who assaulted me with his fists and a dangerous weapon; a cane. In the course of this attack, I was unable to escape, being trapped between the assailant and an immovable concrete bench. I was subsequently placed in the Sensory Deprivation and Isolation Unit (aka: Special Housing Unit or SHU) and issued an Incident Report (Exhibit A). Later, I learned the assailant, Rockey, has an extensive and well known history of assaulting other prisoners, with at least one other incident of also using a weapon in the course of; as well as numerous other incidents of deception and manipulation, to include compromising the integrity and security of the entire Fort Dix - FCI computer system. It has also been revealed that Rockey has significant mental health issues, to include Oppositional Defiance Disorder, Obessive Compulsive Disorder and Pedophilia, amongst others. Therefore, the Fort Dix - FCI staff, through either Rockey's violent history and numerous Incident Reports or Psychological and Medical Records, knew, or reasonably should have known, as was their duty, of Rockey's especial danger to other prisoners health and welfare. As such, Fort Dix - FCI staff has failed in their duty: to protect the prisoners held in custody, including myself, from this known violent and predatory inmate; to provide instructions to staff, United States Citizens, or inmates, in the methods of conflict de-escalation when confronted with an aggressive or mentally unstable inmate threatening imminent attack; to maintain facilities that are free from obstacles or hazards that may impair prisoners safety; to provide and maintain security devices, such as cameras in common areas, that allow for an accurate recording of events after the fact - a matter of the Due Process Clause; or, to provide and maintain "emergency" devices, such as "panic" or "distress" buttons, that allow for the alerting of a need for immediate assistance, such as would be created by an aggressive or violent inmate antagonizing others or

- 39 -

a medical need. However relevant these factors, I was deemed guilty of the conduct in the Incident Report and sanctioned, to include the disallowance of Good Time.

The Eighth Amendment requires prison officials to protect prisoners from violence at the hands of other prisoners. U.S. Constitution, Amend. VIII. Farmer v. Brennan, 511 U.S. 825, 833 (1994). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Id., at 834.

In DeShaney v. Winnebago Social Service, 489 U.S. 189, 199-200 (1989), the Court found that:

> When "[a] State takes a person into its custody and holds him there against his will has a corresponding duty under the Federal Constitution to assume some responsibility for his safety and general well-being; when the State, by affirmative exercise of power, so restrains an individuals liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs- food, clothing, shelter, medical care, and reasonable safety- it transgresses the substantive limit on State action set by the Federal Constitution's Eighth Amendment." (bold emphasis added) See also: Youngberg v. Romeo, 457 U.S. 307, 315-317, 73 L.Ed.2d 28, 102 S.Ct. 2452 (1982); Estelle v. Gamble, 429 U.S. 97 at 103-104, 50 L.Ed.2d 251, 97 S.Ct. 285 at 290-291.

The rationale for this principle is simple enough: "The Amendment... requires that inmates be furnished with basic human needs, one of which is reasonable safety." DeShaney v. Winnebago, supra, at 200. It is "cruel and unusual punishment to hold convicted criminals in unsafe conditions." Youngberg v. Romeo, supra, at 315-316. It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison...." Helling v. McKinney, 509 U.S. 25, 125 L.Ed.2d 22, 113 S.Ct. 2475 (Jan. 13, 1993). A prisoner can maintain and sue under the Constitutions Eighth Amendment protections of cruel and unusual punishment. Hudson v. McMillian, 503 U.S. 1, 117 L.Ed.2d 156, 112 S.Ct. 995 (1992). The Supreme Court expanded on the guidelines for cruel and unusual punishment for inmates who are relegated to segregation. Confinement in prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment. Hutto v. Finney, 437 U.S. 678, 57 L.Ed.2d 522, 98 S.Ct. 2565 (1978).

And the Fourteenth and Fifth Amendment prohibit the government from depriving an inmate from life, liberty, or property without due process of law. U.S. Constitution. Amends. XIV., V. See also: Farmer v. Brennan, supra, (quoting Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 313 (1984)).

Here, we are concerned not with the individual's act of assault, but rather

prison official's failure of duty to protect me from assault by another inmate; a result of "deliberate indifference." "Deliberate indifference" is a subjective, actual-knowledge standard. Farmer v. Brennan, Supra. But the plaintiff need not show that defendants knew of a specific risk to her from a specific source. Id., at 843; Bradley v. Puckett, 157 F.3d 1022, 1025 (5th Cir. 1998). "Knowledge can be demonstrated by circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id., at 842. Here, the Staff of Fort Dix - FCI were well aware of Rockey's propensity for violent behavior, based on previous fights with other inmates, as well as a history of related Incident Reports. Furthermore, the psychological and medical history on record indicates he is not suitable for placement in the general population of prisoners, yet the Staff ignored these repeated warnings. They abated their duty to act. Rockey's history of violence put officials on actual notice of substantial risk. Officials were aware of the threat and likelihood of serious harm to any member of the prison population by this violent and mentally ill inmate, but deliberately ignored the risk. However, officials may not ignore an inmate's history behind bars. They may not place a known "predator" in a position where he can continue to prey on other inmates. Frett v. Government of Virgin Islands, 839 F.2d 968, 978-79 (3d Cir. 1988) (upholding $200,000 verdict where prison officials knew that inmate "posed a serious danger to guards and inmates" but "nevertheless returned him to the general prison population where perfectly foreseeable harm occurred.") See also: Cotton v. Jenne, 326 F.3d 1352 (11th Cir. 2003) (failure to monitor prisoner known to be violent is deliberate indifference); Richko v. Wayne County, 819 F.3d 907, 918-920 (6th Cir, 2016) (8th Amendment claim stated [affirmed] where prison failed to protect detainee from person with history of assault and mental illness); Gates v. Cook, 376 F.3d 323, 343 (5th Cir. 2004) ("the obvious and pervasive nature of these conditions supports the trial courts conclusion that [defendants] displayed a deliberate indifference to these conditions"). Furthermore, the Fort Dix - FCI Facilities Department Staff erected barriers - immovable concrete benches - which created a situation where I was unable to escape the assailant. This violates my Constitutionally protected Rights as well as Bureau of Prisons policies.

In 18 U.S.C. § 4042(a) Duties of Bureau of Prisons, states:

(2) "provide suitable quarters and provide for **safekeeping**, **care**, and subsistence of all prisoners charged with or convicted of offenses against the United States, or held as witnesses or otherwise;"

(3) "provide for the **protection**, **instruction**... of all persons charged with or convicted of offenses against the United States[.]" (Bold emphasis added)

See: <u>Woodward v. Correctional Medical Services</u>, 368 F.3d 917, 930 (7th Cir. 2004) (failure to act in the face of known violations of its written policies is relevant circumstantial evidence to show CMS' knowledge and state of mind"). The Fort Dix -FCI Administration and Safety Department have: failed to provide and maintain recording devices in common areas, which allow for accurate review and accountability; failed to provide and maintain "panic" devices in common areas, which would allow for emergency response in the event of an assault or crisis; failed to establish and instruct prisoners and staff alike in de-escalation techniques in the face of imminent harm by the violent or mentally ill; failed, by erecting barriers - concrete benches - that restricts an inmate ability to escape attack and harm from another inmate and seek relative safety. See: <u>Hadix v. Johnson</u>, 367 F.3d 513, 526 (6th Cir. 2004) ("conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong, because the same information that would lead to the court's conclusion was available to the prison officials").

In conclusion, as a natural-born United States Citizen with Constitutionally established and protected Rights, held in custodial legis at Fort Dix - FCI in Fort Dix, New Jersey, at Will and Duty of the Fort Dix - FCI administration. As such, my Constitutional Rights have repeatedly been violated by the Fort Dix - FCI administration. The only tenable remedy is the relief sought.

- 42 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

Jeremiah J. Salamon, In Propria Persona,
    v.
Stevie Knight; Warden/C.E.O. of Fort Dix - FCI

Memorandum of Law in Support of 28 U.S.C. §§§ 2241, 2242 & 2243
by a Person in Federal Custody
in Appeal of Fort Dix Disciplinary Hearing Officer's Decision

### GROUND FOUR

On June 30, 2020, I met Fort Dix - FCI Staff Officer K. Hampton in Housing Unit 5802, and on August 28, 2020, and September 2, 2020, I was summoned to the lieutenant's office at Fort Dix - FCI, wherein I met with Staff Officer J. Dardin, whereat all three occasions, both Staff Officers introduced themselves as a "Disciplinary Hearing Officer" who both were charged with adjudicating a "Disciplinary Hearing." The happening at said "Disciplinary Hearing" is documented in Section VII. Facts of the Case Before the Court, subsections 9, 10 & 11 of this Appeal, to include being deemed guilty and sanctioned to the Loss of Good Conduct Time (GCT), Disciplinary detention in the Sensory Deprivation and Isolation Unit, Loss of Visiting privileges, amongst other unwritten punitive collateral consequences.

To understand the Power granted to the Bureau of Prisons (BOP) and its agents therein employed, one first must inquire into the authority in which the BOP was founded. The BOP, being a governmental bureaucratic organization was created by an Act of Congress charged with the care of individuals convicted of crimes against the laws of the United States and sentenced by a lawful Judge in good standing to a term of imprisonment under the custodianship of the Attorney General of the United States.

The President of the United States leads the Executive Branch and is charged with the appointment of the Attorney General, a cabinet position within the Executive Branch. "The Attorney General is the head of the Department of Justice (DOJ), and Chief law enforcement officer of the federal government." The Executive Branch | The White House (retrieved October 9, 2021) https://www.whitehouse.gov/about-the-white-house/our-government/the-executive-branch/. Upon recommendation of the Attorney General, the Director of the Bureau of Prisons (BOP) is appointed to

oversee the BOP bureaucracy. Under the Appointment Clause of the United States Constitution, an office holder needs to be nominated by the President of the United States then appointed to position by the United State Senate by confirmation. The Attorney General is thus a member of the Executive Branch as is any agent in the employ of the BOP by way of direct or indirect appointment of the Attorney General making them all members of the Executive Branch holding no judiciary Power. "The federal judiciary operates separately from the Executive and Legislative branches." "Separation of Powers is the fundamental way our government balances Power so that one part of the government doesn't overpower another. The idea is that each branch of government has its own rules and areas of authority." "Judicial Power is the authority to be the final decider in all questions of Constitutional law." Court Role and Structure | United States Court (retrieved October 9, 2021) https://www.uscourts.gov/about-federal-courts/court-role-and-structure.

In order for any agent employed by the government to adjudicate a Disciplinary Hearing, which may result in the application of punitive measures, such as the Loss of Good Time Credit or any other Liberty interests, that agent must be a member of the judiciary. The plastering of a fictitious title to ones name does not make them so, nor does it automatically induce them with the authority or Power of such title. Staff Officer J. Dardin, an employee of Fort Dix - FCI, under the authority of the Bureau of Prisons and the Attorney General, calling himself a Disciplinary Hearing Officer and exercising the Power of Judge is constitutionally deficient because, as required by all judicial officers, both of the United States and all States, he has not sworn the Constitutional Oath or Affirmation, set forth at 28 U.S.C. § 453, pursuant the Constitution of the United States, Article VI, cl. 3. (Every judge in every state is required to take oath of office as prescribed in the Constitution of the United States) State ex rel. Irvine v. District Court, 239 P.2d 272 (Mont. 1951). An agency may not confer Power upon itself. Gorbach v. Reno, 219 F.3d 1087 (8th Cir. 2000).

In order for any agent employed by the government to adjudicate a Disciplinary Hearing, which may result in the application of punitive measures, such as the loss of Good Time Credit or any other Liberty interests, that agent must adjudicate matters in a "hearing" or "court of record" to preserve a record of evidence of the proceeding which is required in any Appeal that may result due to the outcome. "A court of record is a... court in which a record of the proceedings is captured and preserved, for the possibility of appeal." Court of Record, Black's Law Dictionary,

7th Ed. (1999) ("A court that is required to keep a record of its proceedings and that may fine and imprison people for contempt. The court's records are presumed accurate and cannot be collaterally impeached." See also: "of record (of a court) that has proceedings taken down stenographically or otherwise documented." See also: Hahn v. Kelly, 34 Cal. 39 (Cal. 1868) ("A Court of record is that where the acts and judicial proceedings are enrolled in parchment for a perpetual memorial, which rolls are called the records of the Court, and are of such high and supereminent authority that their truth is not to be called in question. The privilege of having these enrolled memorials constitutes the great leading distinction in English and American law between Courts of record, and Courts not of record....".

Since the BOP is controlled by the Executive Branch, any hearings held by its agents are governed by 5 U.S.C. §§§ 554, 556, and 557. "[F]or a court to punish... there must be a record of exactly what was said by whom and so the Power to punish... requires the tribunal have at least a court reporter taking down all proceedings. The rationale is that criminal penalties... may not be imposed unless there is a right of appeal, and an appeal is only meaningful if the trial-level court kept a record of its proceedings." Courts of Record | Wikipedia (retrieved September 8, 2021) https:en.wikipedia.org/wiki/Court_of_record.

A hearing, as used within the BOP, as any proceeding before a Staff Officer calling themselves a "Disciplinary Hearing Officer," acting as a Judge with self-imposed Powers, without a reporter or jury, which evidence and argument is presented to determine some issue or fact or both issue and fact. The Administrative Procedure Act (APA), 5 U.S.C. § 557, governs administrative hearings held by federal agencies which also extends to State laws governing State agencies as well. As such, the record in an adjudicatory proceeding shall include: (a) all notices, pleadings, motions, intermediate rulings, (b) evidence presented, (c) a statement of matter officially noticed except matter so obvious that a statement of would serve no useful purpose, (d) questions and offers of proof, objections thereto, and rulings thereon, (e) proposed findings and exceptions, if any, (f) and finding of fact, conclusions of law or other recommendation made by a presenting officer, and (g) any decision, determination, opinion, order or report rendered. The agency shall make a complete record of all adjudicatory proceedings conducted before it for this purpose, the agency may use whatever means it deems appropriate, including but not limited to the use of stenographic transcription or electronic recording devices. The hearing is recorded on audiotape, or videotape, or by a

reporter, for the purpose of creating written copy of the tape, called a "transcript." United States v. Huggins, 191 F.3d 532 (4th Cir. 1999) Defendant has a right to a meaningful appeal based on a complete transcript. See also: United States v. Neal, 27 F.3d 1035 (5th Cir. 1994); Griffin v. Illinois, 351 U.S. 12, L.Ed 891, 76 S.Ct. 585 (1956).

A Court, within the judiciary, receives the recordings of the administrative proceedings and hears additional evidence at the request of either party, should a question of law be raised that is not within the Power of the administrative tribunal to answer or rule on.

On September 2, 2020, at the "Disciplinary Hearing," as detailed in Section VII. Facts of the Case Before the Court, subsection 11, prior to the commencing of the "Disciplinary Hearing," I started by questioning J. Dardin, "By what Power do you have to conduct this hearing without a record and without notice to me of the nature and cause of my liability to loss of liberty and property by your adjudication, as required by the 14th and 5th Amendments of the Constitution of the United States?" Staff Officer J. Dardin replied, "I'm DHO." I then questioned, "What is DHO, and by what Power do you have authority to conduct this unconstitutional hearing?" Clearly frustrated, Staff Officer J. Dardin answered, "I'll tell you who I am! I'm the Disciplinary Hearing Officer, and I do whatever I want. We are going to conduct this hearing today with or without you. If you don't like it, I will send you to the SHU [Special Housing Unit, aka: Sensory Deprivation and Isolation Unit] right now and then I will come to my own conclusion without you, and I promise it will not be favorable to you. It will be at least a year before you get out of the SHU. Do you understand?" Under duress, I replied, "No, but obviously you are leaving me no choice. You are going to do what you want." At that point Staff Officer J. Dardin conducted the "Disciplinary Hearing." This treatment of me by Staff Officer J. Dardin is quite similar to the treatment Adrian F. King, Jr. received in King v. Rubenstein, 825 F.3d 206; 2016 U.S. App. LEXIS 10276 No. 15-6382 (Jun. 7, 2016), to wit: "Rosencrance told [King], 'Get comfortable you stupid son of a bitch, you'll be in Administrative Segregation until you do as I say and have those marbles removed,' King responded that Rosencrance could not punish him twice for the same violation. Rosencrance said, 'I can do what the fuck I want.'" King was placed in Adminstrative Segregation where he eventually "gave in" and let surgery (which resulted in genital mutilation) be preformed "against [his] will as [he] was coerced by the administration because of threats made" about segregation. The court affirmed the Constitutional violations

- 46 -

in this case and in King's favor.

In conclusion, the fact that Staff Officer J. Darden, acting as a "Disciplinary Hearing Officer," is only permissible had his findings not lead to a punitive outcome of which only a true Judiciary can do. Staff Officer J. Darden, calling himself a "Disciplinary Hearing Officer" and acting as a defacto Judge, within his created Kangaroo Court, is Constitutionally unlawful due to his allegiance being to the Executive Branch. Becuase he did not take an oath of office, swearing to uphold the Constitution, prescribed by 28 U.S.C. § 453, which is based on Article VI, cl. 3. of the Constitution of the United States, he does not have judicial authority. Staff Officer J. Dardin acted ultra vires, and his judgment, imposed sanctions, including the disallowance of "Good Time Credit," placement in the Sensory Deprivation and Isolation Unit, etc... is not lawful, due to Fort Dix - FCI Staff Officer J. Darden not being a Judge as defined in both the Constitution of the United States and Statutory law. Therefore, any decisions made by J. Dardin, including punitive and non-punitive sanctions, is thereby unlawful and must be void.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CAMDEN DIVISION

Jeremiah J. Salamon, In Propria Persona,
  v.
Stevie Knight, Warden/C.E.O. of Fort Dix - FCI

Memorandum of Law in Support of 28 U.S.C. §§§ 2241, 2242 & 2243
by a Person in Federal Custody
in Appeal of Fort Dix Disciplinary Hearing Officer's Decision

### GROUND FIVE

On June 30, 2020, I met Fort Dix - FCI Staff Officer K. Hampton in Housing Unit 5802, and on August 28, 2020, and September 2, 2020, I was summoned to the lieutenant's office where I met with Staff Officer J. Dardin. On each of these meetings, both Staff Officers introduced themselves as a "Disciplinary Hearing Officer" charged with holding and adjudicating a "Disciplinary Hearing." The details at said "Disciplinary Hearing" are documented in Section VII. "Facts of the Case Before the Court" of this Appeal. Therein, it is detailed under subsections 9, 10 & 11, to include being deemed guilty of the alleged offense and sanctioned as punishment to: the Loss of Good Conduct Time (GCT), Disciplinary detention in the prison's Sensory Deprivation and Isolation Unit, the Loss of Visiting privileges, and other unwritten punitive collateral consequences.

The Supreme Court, in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) held that an inmate subject to a prison disciplinary proceeding must be afforded the following Due Process safeguards: the Right to appear before an impartial decision-making body. In that case, the Supreme Court also noted that a prisoner's accumulation of Good Conduct Time (GCT), which can affect the length of incarceration, may raise a concern pertaining to Constitutionally protected liberty interests. Wolff, 418 U.S. at 556-57. Thus, the Supreme Court held that prisoners are entitled to procedures that are sufficient to ensure that any protected interest (i.e., GCT) "is not arbitrarily abrogated." Id. at 557.

In this matter we are not concerned with Staff Officer J. Dardin's unconstitutional role as a self-imposed Judge, nor his conducting of an unlawful hearing. Instead, the issue raised is the conflict of interest posed by J. Dardin as an adjudicator in addition to being a Staff Officer, employed at Fort Dix - FCI. This creates a situation of undeniable bias whereby an employee, whose interests

- 48 -

lie with the Bureau of Prisons, has assumed the Power to punish and sanction a prisoner to a greater term of incarceration. Just as in criminal and civil cases, an impartial decisionmaker is an essential Right of Due Proces that must not be thwarted. The Fourteenth Amendment provides that "[n]o State shall... deprive any person of life, liberty, or property, without Due Process of law." Constitution of the United States, Amendment XIV, § 1 and the Fifth Amendment provides that "[n]o person shall... be deprived of life, liberty, or property, without due process of law." Constitution of the United States, Amendment V. It is well-established that inmates have the Right not to be deprived of a liberty interest without Due Process, and that Right to Due Process extends to prison discipliary hearings. Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004). "The neutrality requirement helps guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of facts or the law.... At the same time, it preserves both the appearance and reality of fairness... by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." Marshall v. Jerrico, 446 U.S. 238, 242 (1980); Schweiker v. McClure, 456 U.S. 188, 195 (1982). See also: Brown v. Nationsbank Corp., 188 F.3d 579 (5th Cir. 1999) The guarantee of Due Process protects Citizens against deliberate harm from government officials.

Sometimes, to ensure an impartial adjudicator, the Due Process Clause requires said adjudicator to recuse himself from the case. In Caperton v. A.T. Massey Coal Co., Inc., the Court noted that "matters of kinship, personal bias, state policy, [and] remoteness of interest, would seem generally to be matters merely of legislative discretion." Caperton, 556 U.S. ___, No. 08 22, slip op. at 6 (2009) (citations omitted). The Court also added, that "[t]he early and leading case on the subject concluded that the Due Process Clause incorporated the common-law rule that a judge must recuse himself when he has 'a direct, personal, substantial, pecuniary interest' in a case," Caperton, Id., quoting Tumey v, Ohio, 273 U.S. 510, 523 (1927). In addition, there "are circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" Caperton, Id. at 6 (citations omitted).

In Williams v. Pennsylvania, the Court found that the Right of Due Process was violated when a judge on the Pennsylvania Supreme Court, who participated in the case denying post-conviction relief to a prisoner convicted of first-degree murder and sentenced to death, had in his former role as a district attorney, given

- 49 -

approval to seek the death penalty in the prisoner's case. Williams, 579 U.S. ___, No. 15-5040, slip op. at 1 (2016). Relying on Caperton, which the Court viewed as having set forth an "objective standard" that requires recusal when the likelihood of bias on the part of the judge is "too high to be constitutionally tolerable." Id. (internal quotations omitted), the Williams Court specifically held that there is an impermissible risk of actual bias when a judge had previously had a "significant, personal involvement as a prosecutor in a critical decisions regarding the defendant's case." Id. at 5-6. The Court based its holding, in part, on earlier cases which had found impermissible bias occurs when the same person serves as both "accuser" and "adjudicator" in a case, which the Court viewed as having happened in Williams. Id. at 6 (citing In re Murchison, 349 U.S. 133, 136-37 (1955). As the only remedy, the case was remanded, as the Williams Court viewed the judge's participation in the multi-member panel's deliberations as sufficient to taint the public legitimacy of the underlying proceedings and constitute reversible error. Id. at 12-13. Likewise, the Court rejected the argument that remanding the case would not cure the underlying Due Process violation because the disqualified judge's view might still influence his former colleagues, as an "inability to guarantee complete relief for a constitutional violation... does not justify withholding a remedy altogether." Id. at 14.

For example, a showing of bias or of strong implications of bias was found when a State Optometry board, made up of only private practitioners, proceeded against other licensed Optometrists for unprofessional conduct because they were employed by corporations. Since success in the board's efforts would rebound to the personal benefit of private practitioners, the Court deemed the interests of the board members to be sufficient to disqualify them. Goldberg v. Kelly, 397 U.S. 254, 267-68 (1970). Therefore, investigating officers, witnesses to the incident and individuals having personal knowledge of material facts or personal interests in the outcome, should not sit on the committee. Gates v. Collier, 454 F.Supp. 579 (N.D. Miss. 1978); Collins v. Vitek, 375 F.Supp. 856 (D. N.H. 1974).

To understand the bias created in this matter by the Bureau of Prisons, Fort Dix - FCI, and the Staff Officers, inquiry must be made into the marco- and micro-economics by which the institution operates. At the macro level, the BOP, being a government bureaucratic organization, was created by an Act of Congress charged with the care of individuals convicted of crimes against the laws of the United States and sentenced by a lawful Judge in good standing to a term of imprisonment under the custodianship of the Attorney General of the United States and his

Department of Justice.

The Department of Justice receives an annual budget, part of which is provided to the Bureau of Prisons for the operation of its penal institutions, such as Fort Dix - FCI. Funds are allocated to each department/facility based on the current prisoner population. Additional funds are also received through various Acts and Programs, such as, but not limited to, the State Criminal Alien Assistance Program (SCAAP), Religious Land Use and Institutionalized Persons Act of 2000, Rehabilitation Act, and First Step Act of 2018. The Department of Justice, the Bureau of Prisons and Fort Dix - FCI, including the Staff thereof, are incentivised, by way of financial gain, to keep as many prisoners in its custody for as long as possible. Methods for detaining as many prisoners as possible and for as long as possible then becomes not only the responsibility of individual facility Staff Officers, but their objective.

At the micro level, a more perverse level of issue, each correctional facility, such as Fort Dix - FCI, is only interested in one thing, and that is bigger budgets. For the Staff Officers, the more prisoners held in confinement, and for longer periods of time, more overtime, more bonuses, and more jobs (nepotistically fulfilled) are available, which equates to more money. They have no interest, nor incentive, to help inmates, prevent injustices, or help free prisoners from incarceration. Although the BOP, and each institution, always indicates they are doing everything right, correct and honorable, and that prisoners are doing everything wrong, the reality is, the BOP, facility administration and Staff Officers can create all the policies, protocols and reports they want, but this is problematic because that leaves each open for interpretation and selective application.

Officials generate paperwork to give the illusion of care and competency, while doing little, and more often nothing, to effectuate any meaningful change or benefit. More to the point, Staff Officers make decisions that require the least amount of work or those that cause the greatest negative outcome for the prisoners. Therefore, when a prisoner, as a result of a fraudulent or real incident, is disallowed Goods Time Days off their sentence, or the sentence is lengthened for some other reason, it feeds into exactly what the institution and Staff Officers want; larger fiscal budgets and more personal monetary gain. One way this is played out against prisoners is through the Disciplinary Hearing process.

The Disciplinary Hearing process is a fundamental problem. It raises the probability of convicting the innocent and, unremedied, casts doubt on the

legitimacy of the process by which adjudication is administered. The Due Process Clauses in the United States Constitution is the solution to this problem. Unfortunately, the Bureau of Prisons, and its employees, systematically ignore Citizen prisoner's Constitutional Rights. For more than a decade now the Bureau of Prisons has turned Disciplinary Hearings into a unconstitutional instrument of internal and unregulated prosecutions due to the lack of third-party oversight. This kind of federal agency hearing and sanction process has become unconstitutional and entrenched part of the "American" incarceration business, even routine, as officials focus on preventing the ongoing decline in the prison population. Simply put, people are not committing crimes and the government, through the BOP, is trying to cling to its livelihood.

In the instant matter, in the aftermath of being assaulted, Special Investigation Section Lieutenant M. Fernandez questioned me as to the details of the incident, however, he issued a fictious report, repleat with simulated facts; Staff Officer/Counselor Jose Cuevas had opportunity to correct the fraudulent record, and despite having accepted written corrections from me, he was derelict in his duty to obey the law, the rules, and the standards of employee conduct since he had been notified as to the fraud, he did not; and Staff Officer J. Dardin, calling himself "Disciplinary Hearing Officer" had opportunity to correct the fraudulent record through my personal statements, as well as eye-witness accounts, but he too was derelict in his duty.

Subsequently, I was deemed guilty of an offense and sanctioned to the loss of Good Conduct Time despite my being the victim in the incident. All the Staff Officers involved are Fort Dix - FCI employees who work along side each other daily with the same goal in mind - keeping prisoners incarcerated for as long as possible, which equates to them gaining more money. If staff Officer, J. Dardin, in determining a finding that is contrary to that of his co-workers and superiors, would create an obvious conflict of interests, one that may negatively impact his current employment, impair future advancement, potential for financial gain, and he would not have job security. In simple terms, they all work for the Bureau of Prisons, they are company men, thus they are all on the same side, opposing any prisoner position, therefore are prejudiced. As a matter of fact, the Bureau of Prisons stated philosophy on its public webpage: "All conflicts between a staff member and an inmate are always in favor of the Staff." For these reasons, he is incapable of being an impartial Hearing Officer and fact-finder.

In conclusion, as a natural-born United States Citizen with Constitutionally established and protected Rights, held in custodial legis at Fort Dix - FCI in Fort Dix, New Jersey, at the Will and Duty of the Fort Dix - FCI administration, my Constitutional Rights, especially the Due Process Clauses, have repeatedly been violated by the Fort Dix - FCI administration. The only tenable remedy is the relief sought in this Appeal.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

Jeremiah J. Salamon, In Propria Persona,
   v.
Stevie Knight, Warden/C.E.O. of Fort Dix - FCI

Memorandum of Law in Support of 28 U.S.C. § 2241, § 2242 & § 2243
by a Person in Federal Custody
in Appeal of Fort Dix Disciplinary Hearing Officer's Decision

## GROUND SIX

On May 27, 2020, after being attacked viciously and without cause, by another inmate, who assaulted me with his fists and a dangerous weapon - a cane, I was interviewed by Special Investigation Section (SIS) Lieutenant M. Fernandez. During the interview I asked SIS Lieutenant M. Fernandez that Edward Leon, and an individual known as Wilson, and others who were in the room and observed Rockey attack me, to be witnesses. I was then taken to the Sensorary Deprivation and Isolation Unit (or sanitized term: SHU).

On June 8, 2020, while still held in the Sensory Deprivation and Isolation Unit, Lieutenant J. Marcucci delivered to me an Incident Report (Exhibit A). I immediately noticed a number of inaccuracies and disparities within Section 11. "Description of Incident." After notifying Lieutenant J. Marcucci of the inaccuracies, he informed me that someone would meet with me before the Disciplinary Hearing to make any corrections.

On June 12, 2020, I met with Housing Unit 5802 Counselor J. Cuevas wherein he took my verbal and written statements (Exhibit F) - ostensibly - to correct errors in the Incident Report (Exhibit A). I also notified him that I wanted Edward Leon and others to be witnesses, and Staff Officer Gary Moody to be the Staff Representative (Exhibit B).

On June 30, 2020, I met Fort Dix - FCI Staff Officer K. Hampton in Housing Unit 5802, and on August 28, 2020, and September 2, 2020, I was summoned to the lieutenant's office where I met with Staff Officer J. Dardin. On each of these meetings, both Staff Officers introduced themselves as a "Disciplinary Hearing Officer" charged with holding and adjudicating a "Disciplinary Hearing." However, only on September 2, 2020 was a so-called "Disciplinary Hearing" conducted. The details of said "Disciplinary Hearing" are documented in Section VII. "Facts of the

- 54 -

Case Before the Court" of this Motion. Therein, it is detailed under subsections 9, 10, & 11, that I was deemed guilty of the alleged offense and sanctioned as punishment to: the Loss of Good Time (GCT), Disciplinary detention in the prison's Sensory Deprivation and Isolation Unit, the Loss of Visiting privileges, and other unwritten punitive collateral consequences.

In this instance we are concerned with the Fort Dix - FCI's Staff Officer, J. Dardin, in the proffered title of "Disciplinary Hearing Officer" conducting a "Disciplinary Hearing" wherein he withheld evidence by: refusing to present the witnesses I repeatedly requested, and take into consideration the witness testimony, which is in violation of the Due Process Clause and Equal Protection Clause of the Constitution of the United States of America, and an Abuse of Discretion.

The Supreme Court, in Superintendent v. Hill, 105 S.Ct. 2768, 86 L.Ed.2d 356, 472 U.S. 445 (June 17, 1985), held "a decision by a prison disciplinary board revoking [Good Time Credits] must be supported by some evidence in the record in order to comport with the minimum requirements of procedural due process." And in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) held that a prisoner "be allowed to call witnesses and present documentary evidence when permitting him to do so will not be unduly hazardous to institutional safety of correctional goals" (opinion by White, J., expressing the view of six members of the court), and that an "inmate's right to present witnesses and submit other evidence in his defense is constitutionally protected and, if unnecessarily abridged, judicially enforceable." Wolff, supra. (Marshall, J., joined by Brennan, J.). These Due Process protections were affirmed in Sandin v. Conner, 515 U.S. 472, 132 L.ED.2d 418, 115 S.Ct. 2293, amongst others. Furthermore, in Edwards v. Balisok, 520 U.S. 641, 646-47, 117 S.Ct. 1584 (1997), refusal to call any witness was "an obvious procedural defect." As such:

28 C.F.R. § 541.5 (2) Discipline Process, states:

> Statement: When the investigation asks for your statement, you may give an explanation of the incident, **request any witnesses be interviewed**, or request that other evidence be obtained and reviewed. [bold and underline emphasis added]

28 C.F.R. § 541.8 (f) governs further:

> Evidence and witness. You are entitled to make a statment and present documentary evidence to the DHO on your own behalf. **The DHO will consider all evidence presented during the hearing.** The DHO's decision will be based on at least some facts **and, if there is conflicting evidence, on the greater weight of the evidence.** Witnesses may appear at the DHO's

hearing as follows:

(1) **Witnesses may appear before DHO in person or electronically** (for example by video or telephone conferencing) at the DHO's discretion.

(2) **The DHO will call witnesses who have information directly relevant to the charge(s) and who are reasonably available.** However, the DHO need not call witnesses adverse to you if their testimoney is adequately summarized in the incident report or other investigation materials.

(3) **You or your staff representative may request witnesses appear at the hearing to testify on your behalf.** Your requested witnesses may not appear if, in the DHO's discrection, they are not reasonably available, their presence at the hearing would jeopardize institution security, or they would present repetitive evidence.

(4) If your requested witnesses are unavailable to appear, written statements can be requested by either DHO or staff representative. The written statement can then be considered during DHO's hearing.
[bold and underline emphasis added]

28 C.F.R. § 541.17(b), provides:

that a prison disciplinary hearing officer shall afford a staff representative adequate time to speak with the inmate and inteview requested witnesses where appropriate.

28 C.F.R. § 541.17(c) instructs:

that a prison disciplinary hearing **officer should call witnesses who are "reasonably available**," including those from outside institution, and request written statements from unavailable witnesses with relevant information.

The "NOTICE OF DISCIPLINE HEARING BEFORE THE (DHO) Form (BP-S294.052) (Exhibit B) states:

**"You will also have the right to call witnesses at the hearing** and to present documentary evidence in your behalf provided, calling your witnesses will not jeopardize institutional safety." (Exhibit B).

The "INMATE RIGHTS AT DISCIPLINARY HEARING Form (BP-S293.052) (Exhibit J) states:

"As an inmate charged with a violation of Bureau of Prisons rules or regulations referred to the Disciplinary Hearing Officer (DHO) for disposition, you have the following rights: ... 3. **The right to call witnesses** (or present written statements of unavailable witnesses) and to present documentary evidence in your behalf, provided institutional safety would not be jeopardize;" (Exhibit J).
[bold and underline emphasis added]

Therefore, it is well-established in Regulation, Case Law, and the BOP's Policies and Procedures that a prisoner has a Right to call witnesses during a disciplinary hearing. Bieber v. Department of Army, 287 F.3d 1358 (Fed. Cir. 2002) The requirements of due process apply to administrative proceedings. Woodward v. Correctional Medical Services, 368 F.3d 917, 930 (7th Cir. 2004) ("failure to act in the face of known violations of its written policies is relevant circumstantial evidence to show CMS' knowledge and state of mind").

To recap, at the inception of this incident, May 27, 2020, I informed the investigating officer, M. Fernandez, that I wanted Edward Leon, and an inmate with either the first or last name of Wilson, and others to be inteviewed as witnesses of the attack.

On May 20, 2020, I met with Unit 5802 Counselor J. Cuevas, whereat I furthered my interest in having Edward Leon, an inmate with the first or last name of Wilson, and others to be witnesses. (Exhibit B).

At each subsequent meeting, with either staff officers K. Hampton or J. Dardin I continued to express that I wanted witnesses to be called. And at the actual "Disciplinary Hearing" on September 2, 2020, the Staff Representative I requested, Gary Moody, was only available via a phone call. During the phone call he informed me that he had reviewed the Incident Report, although he was unable to obtain witness statements, he assured me I had a Right to call them. I then requested inmate Edward Leon, an inmate with either the first or last name of "Wilson" be brought in as witnesses on my behalf. I also informed Staff Officer J. Dardin that these witnesses statements would lead to the calling of additional eye-witnesses. In turn, J. Dardin refused. I then repeatedly pushed and made it clear that I had a Right to call witness. Staff Officer J. Dardin refused all requests for witnesses without providing reason. After some further debate over J. Dardin's Power and authority, and my being under duress, J. Dardin commenced a "Disciplinary Hearing" where he found me guilty of the Prohibited Act in the Incident Report and issued seemingly predetermined sanctions.

It is important to point out that Staff Officer J. Dardin, in his report, has been very careful to provide responses that give the illusion of having provided a fair hearing with all Due Process safeguards. However, this is not the case.

Courts across the country have found actions similar and exactly the same as that of Staff Officer J. Dardin's to be a violation of Constitutionally protected Rights. Prisoners faced with revocation of good-time credits have qualified due

- 57 -

process right to call witnesses in their defense. Whitlock v. Johnson, 153 F.3d 380 (7th Cir. 1998). An agency is not free to reach a conclusion simply by ignoring evidence contrary to the conclusion. Delta Foundation, Inc. v. United States, 303 F3d 551 (5th Cir. 2002). An inmate has the right to submit names of requested witnesses and have them called to testify and to present documents on the inmate's behalf. The Disciplinary Hearing Officer shall ["shall means must," Hicks v. Miranda, 422 U.S. 332, 352 45 L.Ed.2d 223, 95 S.Ct. 2281 (1975); See also: Kingdomware Technologies, Inc. v. United States, 579 U.S. 162, 171-172, 136 S.Ct. 1969, 1972, 195 L.Ed.2d 334 (2016)] call those witnesses who have information directly relevant to the charge(s) and who are reasonably available. 28 C.F.R. § 541.17(c) implements protection of a liberty interest in the statutory good time credits that cannot be taken from him in a prison Disciplinary Hearing without Due Process of law. These Due Process safeguards include the Right to call and present witnesses in his defense. Kingsley v. Bureau of Prisons, No. 89-2399, 937 F.2d 26; 1991 U.S. App. LEXIS 13098 (Jun. 24, 1991). Smith v. Mass. Dep't of Correction, 936 F.2d 1390, 1401 (1st Cir. 1991) (potential due process violation because prison officials failed to present reasons for denying prisoner opportunity to question key witness or obtain discovery potentially exculpatory documents). Serrano v. Francis, 345 F.3d 1071, 1079-80 (9th Cir. 2003) (due process violation because correctional officer failed to document reason for refusing to allow prisoner to call witness at disciplinary hearing). Ponte v. Real, 471 U.S. 491, 497 (1985) Prison officials must provide an explanation if they refuse to allow an inmate to call a witness at a disciplinary hearing, and the explanation must be logically related to institutional safety or correctional goals. Ayers v. Ryan, 152 F.3d 77, 81 (2d Cir. 1998) (due process violation when official failed to obtain testimoney from prisoner's requested witnesses and provided no rational explanation). Toolasprashed v. Bureau of Prisons, 286 F.3d 576; 351 U.S. App. D.C. 64; 2002 U.S. App. LEXIS 7240; 52 Fed.R.Serv, 3d (Callaghan) 659 No. 00-5424 Apr. 19, 2002) "the truth underlying the challenged statements was clearly provable or relatively easily ascertainable. In typical cases, where truth can readily be ascertained, it is feasible, necessary, and proper, for the agency and, in turn, the district court to determine whether each filed item of information is accurate." See also: Deters v. United States Parole Commission, 85 F.3d 655, 318 U.S. App. D.C. 89; 1996 U.S. App. LEXIS 13486 No. 94-5237 June 7, 1996.

I explained that these individuals would provide testimony that would contradict the inaccurate statements reported in Section 11 of the Incident Report

(Exhibit A). Hughes v. Johnson, 191 F.3d 607 (5th Cir. 1999) A defendant's right to due process is violated when, upon a request for exculpatory evidence, the government conceals evidence that is both favorable to the defendant and material to the defendant's guilt or punishment. Howard v. U.S. Bureau of Prisons, 487 F.3d 808, 814 (10th Cir. 2007) (due process violation because prison officials refused to allow prisoner to submit favorable documentary evidence without showing evidence submission would be "unduly hazardous to institutional safety or correctional goals"); Ellison v. Zatecky, 820 F.3d 271, 274 (7th Cir. 2016) (due process violation because prison officials failed to allow prisoner to present evidence to refute officer's conduct report.) Courts have been "troubled by the government's contention that witnesses in BOP custody need not be made available, either for live testimony or to produce written statements, simply because they have been assigned to halfway houses." See: Moscato v. Federal Bureau of Prisons, 98 F.3d 757, 762 n.9 (3d Cir. 1996) (expressing discomfort with government's characterization of witnesses transferred to other facilities as catagorically "unavailable"); Forbes v. Trigg, 976 F.2d 308, 317 (7th Cir. 1992) (explaining that rules categorically barring certain classes of witnesses are unconstitutional).

Although, Fort Dix - FCI staff officer J. Dardin did include in the "DISCIPLINE HEARING OFFICER REPORT" (Exhibit C) in Section III. PRESENTATION OF EVIDENCE, Section C. Witness: 1. The inmate requested witnesses. Yes.; 2. The following persons were called as witness at this hearing and appeared: N/A; 3. A summary of the testimoney of each witness is attached: N/A; 4. The following persons requested were not called for the reason(s) given: Inmate Leon, Edward Register No.: 21669-052, the DHO believed this witness statement would be adverse due to his knowledge of the incident is adequately summarized in the section 11 narrative of the incident report and other investigative materials.; 5. Unavailable witnesses were requested to submit written statements and those statements received were considered N/A.

In a Disciplinary Hearing, it is the function of the Disciplinary Hearing Officer to review not just the evidence but the credibility of the evidence provided in exercising their discretion. The Disciplinary Hearing Officer's ability to review evidence is extremely narrow: the standard of review is whether there is "some evidence". The inquiry is whether there is a rational basis in the record to support the fact-finder's ultimate conclusion. However, where the prisoner disputes the accuracy of evidence presented, or provides additional countervailing evidence, the DHO is required to resolve the dispute by determining whether it is supported

- 59 -

by substantial evidence or a proponderance of the evidence, not just "some evidence." Pursuant to 28 C.F.R. § 541.8 (f) "The DHO's decision will be based on at least some facts and, if there is conflicting evidence, on the greater weight of the evidence." Disputes as the accuracy of the information before it shall be resolved by the preponderance of the evidence standard; that is, the DHO shall rely on such information only to the extent that it represents the explanation of the facts that best accords with reason and probability. Redding v. Holt, No. 07-3397, 252 Fed. Appx. 488; 2007 U.S. App. LEXIS 25464 (Oct. 30, 2007). Desert Citizens Against Pollution v. Bisson, 231 F.3d 1172 (9th Cir. 2000) Agency must articulate rational connection between facts found and conclusions made.

While there is the "some evidence" standard found in Superintendent, Massachusetts Correctional Institution, Walpole v. Hill, 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), this standard has not been met, and cannot be met when there is no Staff Officer observation of an incident nor reviewable video camera recording. At that point, any determinations are based on speculation and circumstance, but not evidence. For this reason, the "some evidence" standard cannot be found. To find otherwise, for example, in a situation where 100 prisoner's and two (2) Staff Officer's are in the recreation yard. However, the officers decide to close the yard so they can sit in their air conditioned offices. They do this by ordering all the prisoners back to their units, stating that the sky is brown and a storm is coming. Although, all the prisoners see is a sunny blue sky and beautiful weather. Now, when this turns into an incident between the staff and prisoners, the DHO applies the "some evidence" standard, sighting that two Staff Officers saw a brown sky, and find the prisoners to be wrong. Completely discounting the fact that 100 inmates witnessed the contrary. Therefore, the "some evidence" standard fails in every circumstance where there exists easily obtainable evidence that outweighs the biased opinion of Staff Officers. The reality is that disciplinary hearings and the imposition of disagreeable sanctions necessarily involve confrontation between inmates and biased authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. The sole evidence against the inmate would be statements by guards. Although, such statements should be, but are not typically found to be in Disciplinary Hearings, to be inadequate because such all inclusive statements are so blatantly implausible when taken literally that they do not constitute even "some evidence" of a particular prisoner's wrongdoing.

- 60 -

The first and greatest fault with the Disciplinary Hearing Officer Report and DHO finding is Staff Officer J. Darden's use of a scheme giving the illusion that a Fort Dix - FCI staff member was an actual witness to the underlying incident. See: "DISCIPLINE HEARING OFFICER REPORT" (Exhibit C), Section V., pages 3, paragraph 5, and page 4, paragraph 2, "DHO considered SIS Investigation authored and submitted by M. Fernandez, SIS Lieutenant, detailing the investigative account of all known/observed facts in reference to the interaction..." and "Your reported/observed actions met the threshold for..." and "...also at point did the DHO observe you trying to...") (Underline emphasis added). This is not only false, but fraudulent. I was attacked in a television room containing only prisoners, no staff members. SIS Lieutenant M. Fernandez, who did not witness the incident, could not offer anything other than hearsay testimony. This brings about the matter of evidence.

The second issue is the finding of guilt was based on zero evidence. See: "DISCIPLINE HEARING OFFICER REPORT" (Exhibit C), Section V., page 3, paragraph 6, "You were noted to have no injuries consistent with being involved in a fight." However, guilt was determined on "...the greater weight was given to the reporting staff member..." (See: "DISCIPLINE HEARING OFFICER REPORT", page 4, paragraph 1) and "The DHO gave greater weight to the staff member's investigative account of the incident as described in the section 11 narrative of the incident report...". However, I repeatedly contested at every step leading up to, and including at the "Disciplinary Hearing" that Section 11 of the Incident Report was inaccurate. (See: "DISCIPLINE HEARING OFFICER REPORT", page 3, paragraph 4, "...your testimony during the DHO hearing in which you deny the incident report was completly true."). Therefore, Staff Officer J. Dardin admits to relying on the disputed Incident Report in reaching a finding of guilt.

Due to this inaccurate Incident Report, I repeatedly, at all steps leading up to, and including at the "Disciplinary Hearing" requested numerous witnesses to correct the inaccurate Section 11 record as authored by SIS Lieutenant M. Fernandez. However, J. Dardin refused to allow any witnesses to testify. At this point, it is essential to enter into the Record the Sworn Affidavits of witnesses: Edward Leon (Exhibit G), Wilson Guillen (Exhibit H), and David Blansky (Exhibit I). Each individual witnessed the underlying incident, and while their individual accounts are not perfectly in-line with each other, the common and overwhelming narrative is that Shawn Rockey attacked me, and that I did not "fight" him. Instead, I sought a means of escaping the attack. This countervailing evidence

proves Staff Officer J. Dardin's "belie[f the] witness['s] statement would be adverse due to his knowledge of the incident is adequately summarized in the section 11 narrative of the incident report and other investigative materials." (See: "DISCIPLINE HEARING OFFICER REPORT", page 4, paragraph 1). That being said, had Staff Officer J. Dardin honored my Right to call witnesses, they would have revealed that the narrative in Section 11 was inaccurately conveyed by SIS Lieutenant M. Fernandez. This would have also affirmed that there was zero evidence in which to determine a finding of guilt. In Zavaro v. Coughlin, 970 F.2d 1148 (2d Cir. 1992), the "some evidence" was not met when only Staff Officers statements are relied upon to determine an inmate guilty. However, absent any other actual evidence, did not constitute even "some evidence" standard. "The Supreme Court has utilized the "some evidence" standard in the past as a standard of review, not as a standard of proof." Hamdi v. Rumsfeld, 124 S.Ct. 2633, 159 L.Ed.2d 578, 542 U.S. 507 (June 28, 2004).

This also raises an Eleventh (11th) Amendment Equal Protection Clause violation as Staff Officer J. Dardin unilaterally decides whether requested witnesses will be presented, but grants such requests for other prisoners similarly situated while denying the same requests by others. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 87 L.Ed.2d 313, 105 S.Ct. 3249 (1985) The equal protection clause essentially requires that all persons similarly situated be treated alike. Equal protection violation occurs when government treats someone differently than another who is similarly situated.

The Supreme Court, in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) held that an inmate subject to a prison disciplinary proceeding must be afforded the following Due Process safeguard: the Right to call witnesses and present documentary evidence...". The operative word being "and". In that case, the Supreme Court also noted that a prisoner's accumulation of Good Conduct Time (GCT), which can affect the length of incarceration, may raise a concern pertaining to Constitutionally protected liberty interests. Wolff, 418 U.S. at 556-57. Thus, the Supreme Court held that prisoners are entitled to procedures that are sufficient to ensure that any protected interest (i.e., GCT) "is not arbitrarily abrogated." Id. at 557.

The Fourteenth Amendment provides that "[n]o State shall... deprive any person of life, liberty, or property, without Due Process of law." Constitution of the United States, Amendment XIV, § 1 and the Fifth Amendment provides that "[n]o person shall... be deprived of life, liberty, or property, without due process of

law." Constitution of the United States, Amendment V. It is well-established that inmates have the Right not to be deprived of a liberty interest without Due Process, and that Right to Due Process extends to prison discipliary hearings. Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004).

The Right of a prisoner to call witnesses and present documentary evidence is at the heart of Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), requirements. Therefore, my Due Process of law Rights have been violated whereas my eye witness statements, which were documentable evidence, was not taken in good faith or consideration by Staff Officer J. Dardin in the self-imposed title of "Disciplinary Hearing Officer" to corroborate with my testimony of being attacked and self-defense. I have also been denied Equal Protection of Law by staff where medical assessments and photograghs prove that I suffered defensive injuries, and the "Discipline Hearing Officer Report (Exhibit C), Section V., page 3, paragraph 6, wherein it states, "You were noted to have no injuries consistent with being involved in a fight."

In conclusion, I am a natural-born Citizen with Constitutionally, statutory, and procedurally established and protected Rights, held in custodial legis at Fort Dix - FCI in Fort Dix, New Jersey, at the Will and Duty of the Fort Dix - FCI Administration. As such, my Constitutional, statutorial and procedural Rights have repeatedly been violated by the Fort Dix - FCI administration. The only tenable remedy is the relief sought.

- 63 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

Jeremiah J. Salamon, In Propria Persona,
   v.
Stevie M. Knight, Warden/C.E.O. of Fort Dix -- FCI

Memorandum of Law in Support of 28 U.S.C. § 2241, § 2242 & § 2243
by a Person in Federal Custody
in Appeal of Fort Dix Disciplinary Hearing Officer's Decision

### GROUND SEVEN

On May 27, 2020, I was viciously and without cause attacked by another inmate who assaulted me with his fists and a dangerous weapon - a cane. Subsequently I was placed in the Sensory Deprivation and Isolation Unit (or sanitized term: SHU), issued an Incident Report, and eventually a Fort Dix - FCI Staff Officer, J. Dardin, in the proffered title of  Disciplinary Hearing Officer" conducted what he titled a "Disciplinary Hearing." Despite my numerous protests, objections, procedural and statutorial deficiencies and Civil Rights violations, Staff Officer J. Dardin, unilaterally came to a finding of guilt, and imposed numerous seemingly predetermined sanctions.

For a prisoner wishing to Appeal the decision made in a Disciplinary Hearing, they must do so through the Administrative Remedy Process, at the Facility level. These same procedures must be exhausted before the prisoner can petition the Court for a redress. This is established in 42 U.S.C. § 1997e, which provides:

> No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983]... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The Right of petition is expressly set out in the First Amendment of the Constitution of the United States as:

> Congress shall make no law... abridging the... right of the people... to petition the Government for a redress of grievances.

The Petition Clause concludes the First Amendment's ringing enumeration of expressive Rights and, in many ways, supports them all. Petition is the Right to ask the government, at any level, to correct a wrong or solve a problem. The Right to petition allows Citizens to focus government attention on unresolved ills, provide information to elected leaders about unpopular policies, expose misconduct,

- 64 -

waste corruption, incompetence, and vent popular frustrations without endangering the public order. United States v. Cruikshank, 92 U.S. 542, 552 (1876), reflects this view. The Right of peaceable assembly is, in the language of the Court, congnate to those of free speech and free press and is equally fundamental.... ⌊I⌋t is **one that cannot be denied without violating those fundamental principles of liberty and justice** which lie at the base of all civil and political institution, principles which the Fourteenth Amendment embodies in the general terms of its due process clause.... (bold and underline emphasis added) DeJonge v. Oregon, 299 U.S. 353, 364 365 (1937). See also Herndon v. Lowry, 301 U.S. U.S. 242 (1937). Furthermore, the Right of petition has expanded. It is no longer confined to demands for a redress of grievances, in any accurate meaning of these words, **but comprehends demands for an exercise by the government of its powers in furtherance of the interest and prosperity of the petitioners and of their views on contentious matters.** (bold and underline emphasis added) Eastern R.R. Presidents Conf. v. Noerr Motor Freight, 365 U.S. 127 (1961). The Right extends to the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, arms of the executive) and to Courts. Certainly the Right to petition extends to all departments of the Government. The Right of Access to the Courts is, indeed, but one aspect of the Right of Petition.

The Petition Clause is the tacit cornerstone in Constitutional analysis, the fundamental Right from which other expressive freedoms arise. **Why speak, why publish, why assemble against the government at all if such complaints will only be silenced?** As Justice John Paul Stevens in his dissent in Minnesota Board for Community Colleges v. Knight, 104 S.Ct. 1058, 79 L.Ed.2d 299, 465 U.S. 271 (Feb. 21, 1984), "The First Amendment was intended to secure something more than an exercise in futility." See also: Marbury v. Madison, (1803), "[N]o provision of the Constitution was meant to be without effect." In United Mine Workers of America v. Illinois State Bar Association, (1967), the U.S. Supreme Court exalted the Right as "**among the most precious liberties safeguarded by the Bill of Rights**" and implicit in "the very idea of government." (bold and underline emphasis added) Hence, in NAACP v. Button, 1963), it formed the conceptual basis for the Court's ruling that a civil rights group could not be barred from soliciting people to serve as litigants in civil rights cases. The Court declared: "**Litigation may well be the sole practical avenue open to a minority ⌊prisoners⌋ to petition for a redress of grievances.**" (bold and underline emphasis added).

And the Supreme Court held that, like others, prisoners have a constitutional

- 65 -

right to petition the government for redress of their grievances, which includes a reasonable right of access to the courts. Johnson v. Avery, 393 U.S. 483, 21 L.Ed 2d 718, 89 S.Ct. 747 (1969). See also: Hudson v. Palmer, 468 U.S. 517, 82 L.Ed.2d 393, 104 S.Ct. 3194 (1984), prisoners have a Constitutional Right to petition the government for redress of their grievances, which includes a reasonable Right of Access to the Courts.; Tarpley v. Allen County, Indiana, 312 F.3d 895 (7th Cir. 2002) Prisoners seeking to vindicate their rights in court enjoy a constitutional right of access to courts, and state actors may not impede their efforts to pursue legal claims.; Madrid v. Gomez, 150 F.3d 1030 (9th Cir. 1998) Prisoners possess right of access to the courts not only to pursue appeals from criminal convictions, but also to assert civil rights actions; Chriceol v. Phillips, 169 F.3d 313 (5th Cir. 1999) Prisoners clearly have a constitutionally protected right of access to the courts. Interference with a prisoners right to access the court, [ ] may result in a constitutional deprivation; Cruz v. Beto, (1972) 405 U.S. 319, 31 L.Ed.2d 263 92 S.Ct. 1079, 497 F.2d 496 the Court stated, "that persons in prison, like other individuals, have a right to petition the government for redress of grievances, which includes "access of prisoners to the courts for the purpose of presenting their complaints."

The Constitutional Right of Access to the Courts, as enunciated by the Supreme Court of the United States, has two major aspects. One is the now well-established principle that prison inmates have a Right of Access to the Courts, as a corollary of the constitutional guaranty of due process, and in certain cases, as a consequence of the constitutional principles of equal protection, the right to petition the government for redress of grievances, and the Right to petition for a writ of habeas corpus. The second aspect is the equally well-established rule that once a state, or the Federal Government, establishes procedures of appellate review of criminal convictions, it must insure equal and open access to those procedures for all appellants, not just for the economically well-off, a principle derived from constitutional guaranties of due process and equal protection. And one district Court, in a decision affirmed without opinion by the Supreme Court, has defined Access to the Courts as encompassing "**all the means a defendant or petitioner might require to get a fair hearing from the judiciary on all charges brought against him or grievances alleged by him.**" (Bold and underline emphasis added) Gilmore v. Lynch, 319 F.Supp. 105, affd 404 U.S. 15, 30 L.Ed.2d 142, 92 S.Ct 250. Since that time the Supreme Court has given content to the principle established and has expanded the right described therein to insure that inmate

- 66 -

Access to the Courts is "adequate, effective, and meaningful" <u>Bounds v. Smith</u>, (1977) 430 U.S. 817, 52 L.Ed.2d 72, 97 S.Ct. 1491.

As such, the Department of Justice and Bureau of Prisons has established a grievance system/Appeal process for prisoners seeking to challenge their conditions of confinement, codified at 28 C.F.R. § 40.1 - 40.22 Standards for Inmate Grievance Procedures and 28 C.F.R. § 542.10 - 542.19 Administrative Remedy Program. The details of which are in Section "VIII. REQUIREMENTS UNDER THE PRISON LITIGATION REFORM ACT" of this Petition, and furthermore below.

In this instant matter we are concerned with the Staff of Fort Dix - FCI preventing me from being able to exercise the before mentioned Rights the legally imposed requirement to exhaust Administrative Remedies; and my Access to the Courts. This was done, as indicated in this Petition, Section "VIII. REQUIREMENTS UNDER THE PRISON LITIGATION REFORM ACT § Administrative Remedy Steps Taken." As the only place to obtain the grievance/Appeal Forms as required by 28 C.F.R. § 542.14(c) ("The inmate shall obtain the appropriate Form from CCC staff or institutional staff."), on or about November 5, 2020, I went to Housing Unit 5802 Staff Alley (Staff Alley is a single, isolated wing or corridor of the Housing Unit where Unit Team Staff - comprised of the Unit Manager, Unit Case Manager(s), Unit Counselor(s), and Unit Secretary - maintain offices and conduct Unit business), where, due to the unavailibility of Housing Unit 5802 Team Counselors, I went to the only available Housing Unit 5802 Team Staff member present, Unit 5802 Team Case Manager Bradley Vogt and requested the required Administrative Remedy Appeal Form (BP-10). Team Case Manager Bradley Vogt refused to provide the Form, instead, instructed me to "get that from your Counselor," and sent me away.

This is a violation of:

(1) 28 C.F.R. § 40.5 as,

> **[a]t a minimum, the grievance procedure shall permit complaints by inmates** regarding policies and conditions within the jurisdiction of the institution or the correctional agency that affect them personally, as well as actions by employees and inmates, and incidents occurring within the institution that affect them personally. (bold and underline emphasis added)

(2) 28 C.F.R. § 40.7 as,

> **[n]ecessary materials [Grievance/Appeal Forms] shall be freely available to all inmates....**" (bold and underline emphasis added)

Then, on the following day, I went back to Housing Unit 5802 Team Staff Alley, where, of the two (2) Unit 5802 Team Counselors that are potentially available in

Housing Unit 5802, only Unit Team Counselor Jose Cuevas was present this day. I met him and explained my effort to obtain a Regional Administrative Remedy Appeal Form (BP-10) from Unit Team Staff the previous day, and then requested the same from him. Unit Team Counselor Jose Cuevas demanded I explain the issue I wanted to grieve/Appeal, after which he refused to provide the required BP-10 Form, stating, "DHO made their decision, just live with it. You've got nothing coming to you." In turn, I objected, "I am trying to appeal this issue, as I was attacked, and I need that Form." Jose Cuevas replied, "Well I'm not giving it to you. You need to learn your just an inmate at Fort Dix, you don't get what you want." He then ordered me to leave.

As the Unit Team Staff deliberately  intentionally and repeatedly impeded my Right and requirement to exercise and exhaust the Administrative Remedies as required by BOP policies and the PLRA, these actions are in violation of:

(1) 28 C.F.R. § 40.7(a) as,

> **⌊n⌋ecessary materials ⌊Grievance/Appeal Forms⌋ shall be freely available to all inmates....** (bold and underline emphasis added)

(2) 28 C.F.R. § 40.7(f) as,

> **⌊a⌋ request for review shall be allowed automatically without interference by administrators or employees of the institution** and such review shall be conducted without influence or interference by administrators or employees of the institution. (bold and underline emphasis added)

By creating a gatekeeper scenario by screening my issue to deem whether it met Fort Dix - FCI staff's personal standard of Appeal, and only then providing the required Form donning either staff initials or a signature and date, is exhaustion. The Court in Ex parte Hull, (1941) 312 U.S. 546, 85 L.Ed 1034, 61 S.Ct. 640, reh den documents to initial approval by prison authorities before they could be directed to the Courts was invalid, in that it constituted an improper abridgment or impairment of an inmate's right to apply to a federal Court for a writ of habeas corpus. The principle that unimpeded transmission of mail is the "most obvious and formal manifestation" of the right of access to the Courts, Crower v. Synard, 884 F.2d 804, 811 (5th Cir. 1989), has been clearly established for some time and that any action which prevents an individual from communcating with the Court or legal Right to an institutional hearing, constitutes denial of access to the Court itself and thus violates a recognized Constitutional Right. Collins v. Gourd, 438 F.Supp.2d 399, 415 (S.D.N.Y. 2006) (holding that facility personal invented a screening procedure and did not allow him to file his grievance raised a material

issue under "**an exception to the PLRA's exhaustion requirement where prison authorities actively obstruct an inmate's ability to properly' file a prison grievance.**" (bold and underline emphasis added) See also: Cabrera v. LeVierge, 2008 WL 215720, *6 (D.N.H  Jan  24, 2008) (Defendant's reliance upon undisclosed rules to reject plaintiff's grievance form necessarily estops them from relying upon plaintiff s failure to exhaust those remedies as a defense."; Tinsley v. Giorla, 2008 WL 901697, *5 (E.D. Pa. Apr. 1  2008) (if a prison official told a prisoner a decision could not be appealed, contray to written grievance policy  the grievance procedure could be found unavailable); Blout v. Fleming, 2006 WL 1805853, *2-4 (W.D  Va. June 29, 2006) (stating "when prison officials prevent an inmate from access to or use of a prison inmate's grievance system, **an inmates failure to exhaust is excused because he had no 'available' administrative remedy.**" (bold and underline emphasis added); Kaba v. Stepp, 458 F.3d 678, 684-85 (7th Cir. 2005) In particular, remedies are not available if prison officials fail to respond to a properly filed form or **refuse to provide forms to an inmate who requests them. If prison officials make administrative remedy unavailable by misconduct, mistake, or inaction, the exhaustion requirement is obviated.** (bold and underline emphasis added); Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008) (**[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it.**" (bold and underline emphasis added); Russo v. Honen, 755 F.Supp.2d 313, 315 (D. Mass. 2010) (**failure to provide grievance form makes remedy unavailable**) (bold and underline emphasis added); Davis v. Milwaukee County, 225 F.Supp.2d 967, 975-76 (E.D. Wis. 2020), the Court held that the plaintiff had been denied access to the Courts by defendants' hindering his ability to exhaust, inter alia, by failing to make available materials [Forms] concerning the grievance procedure.; Miller v. Norris, 247 F.3d 736, 2001 U.S. App. LEXIS 6209 No. 00-1053 (Jan. 8, 2001) (The Court "determined that **appellant was only required to exhaust the administrative remedies available to him prior to bringing suit.**) (bold and underline emphasis added); Liggins v. Barnett, 2001 U.S. Dist. LEXIS 25767 NO. 4-00-CV-90080 (May 15, 2001) (quoting Miller v. Norris) (holding that prison officials failure to provide grievance form raised inference that plaintiff exhausted administrative remedies.).

While the beforementioned violations expose just some of the methods the Bureau of Prisons staff used to deprive me of my Civil Rights, some others in this elaborate scheme to obstruct Citizens Rights include:

· Staff refuse to provide required Forms, a violation of 28 C.F.R. § 40.7(a)

- Reasonable range of meaningful remedies not available, a violation of 28 C.F.R. § 40.6

- Staff employees involved in the matter participate in resolving the grievance, a violation of 28 C.F.R. § 40.7(c)

- Replies are not "reasoned" or fail to explain reasons for decision, a violation of 28 C.F.R. § 40.7(d)

- No written replies, a violation of 28 C.F.R. § 40.7(d)

- Responses not provided within prescribed time limits, a violation of 28 C.F.R. § 40.7(e)

- No option for review of decision by entity not under the institution's supervision, a violation of 28 C.F.R. § 40.7(f)

- Reprisals and/or retaliation for filing grievance/Appeal, a violation of 28 C.F.R. § 40.9

- Grievance/Appeal not treated as confidential. Staff often allow other inmates to be present when issues are being discussed with staff, sometimes creating privacy issues due to medical sensitivity or safety issues for an inmate trying to utilize the Administrative Remedy process, a violation of 28 C.F.R. § 40.10

- Staff directly responsible for the processing of Administrative Remedy Forms "lose" submitted Forms

- Submitted grievance/Appeal Forms often go unanswered well beyond the timelines established in 28 C.F.R. § 542.18, and facility Staff refuse to issue next level grievance/Appeal Form because previous response was not received and provided to Staff member as proof, a violation of 28 C.F.R. § 40.7(a), 28 C.F.R. § 40.7(d) and 28 C.F.R. § 40.7(e)

- When Staff responsible for answering submitted grievance/Appeal Form(s) miss the deadline to respond to a filed grievance/Appeal, with unchecked authority or oversight they provide themselves an extension without notifying the grievant/Appellant. And oftentimes the extension time is for a greater amount of time, as much as twice as long, as established in the guidelines. However, if a grievant/Appellant needs additional time to respond requests for extension are ignored causing the grievant/Appellant to become time-barred. This is in violation of 28 C.F.R. § 542.18.

- Staff responsible for answering grievance/Appeal fraudulently reject submitted Forms claiming they are illegible, even though the submitted Forms are typed. And they impose an impossible, or nearly impossible timeline in which to resubmit grievance/Appeal.

- Staff responsible for processing or answering Administrative Remedy Forms discard accompanying "Attachment" or "Exhibit" pages and thereby fraudulently reject the submitted grievance/Appeal Form due to a lack of adequate copies being submitted along with the grievance/Appeal Form.

- The posted hours of availability of Unit Team staff members in which to obtain Administrative Remedy Forms are more often than not adhered to. Staff lock the only door to Staff Alley and the Forms and refuse to acknowledge posted hours or waiting prisoners. Forms are thereby unavailable and this delay often extends to the point of the prisoners issue being time-barred from filing grievance/Appeal.

The above list is far from exhaustive or all inclusive. Inasmuch, I initially attempted to exercise my Right while fulfilling the requirement to grieve/Appeal

this matter pursuant to the guidelines established in 28 C.F.R. § 542.10 - 542.19, on November 6, 2020. However, the only available staff member in Housing Unit 5802 refused to provide to proper and required Administrative Remedy Form and ordered me to obtain the Form from another Fort Dix - FCI staff employee. And on November 7, 2020, I again attempted to obtain the required BP-10 Administrative Remedy Form, but the only available staff member refused to provide the Form. Therefore, I exhausted what remedies were truly "available" because the Bureau of Prisons staff, as a matter of everyday practice, have misused their authority and rejected or denied every attempt to remedy the issue or exhaust prior to bringing suit - the main reason the Prison Litigation Reform Act was voted in. Abraham v. Costello, 717 F.Supp.2d 391 (D. Del  2010) Inmate was excused for his failure to exhaust inasmuch as he was not provided grievance Forms despite his repeated written and oral requests. Thus, my ability to exhaust has been under attack since inception and I have now seen and felt the overall effect of abuse the process has on my Rights to Access the Courts. In light of such, Courts across the country have found, in Johnson v. Ashcroft, 286 F.3d 696 (3d Cir. 2002) If agency departs from an announced rule without explanation or an avowed alteration, such action could be viewed as arbitrary, capricious, or an abuse of discretion; United States v. Lee, 274 F.3d 485 (8th Cir  2001) "ACCARDI Doctrine" bars administrative agencies from taking action inconsistent with their internal regulations with their internal regulations when it would affect individual rights; Woodward v. Correctional Medical Services, 368 F.3d 917, 930 (7th Cir. 2004) ("failure to act in the face of known violations of its written policies is relevant circumstantial evidence to show CMS' knowledge and state of mind"); Johnson v. Avery, 393 U.S. 483  485 (1969) (prisoners rights of access to court may not be denied or obstructed).

Therefore, the Prison Litigation Reform Act mandates that a prisoner must exhaust available Administrative Remdies prior to bringing suit in the Courts. Proof of exhaustion is determined by the prisoner/Petitioner submitting copies of the Adminstrative Remedy Forms to the Court as evidence, which thereby makes Administrative Remedies Forms legal documents, crucial or essential to a pending or contemplated appeal. Chatham v. Adcock, 2007 WL 2904117, *14 (N.D. Ga., Sept. 28, 2007) **"It would be an anomalous result, indeed, if prison officials could foreclose prison inmates from filing civil rights lawsuits in federal court simply by depriving them of the means to fulfill a mandatory prerequisite to doing so."** (bold and underline emphasis added); Campbell v. Chaves, 402 F.Supp.2d 1101, n.3 (D.Ariz. 2005) noting the danger that grievance systems might become "a series of stalling

- 71 -

tactics, and dead-ends without resolution.". <u>Rhames v. Federal Bureau of Prisons</u>, 2002 WL 1268005, *5 (S.D.N.Y., Jun. 6, 2002) "While it is important that prisoners comply with administrative procedures designed by the B.O.P., rather than using any they might think sufficient... **it is equally important that form not create a snare or forfeiture for a prisoner seeking redress for perceived violations of his Constitutional Rights.**" (bold and underline emphasis added) <u>Dole v. Chandler</u>, 438 F.3d 804. 812 (7th Cir. 2006) "Prison officials may not take unfair advantage of the exhaustion requirement... and **a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting.**" (bold and underline emphasis added) <u>Davis v. Milwaukee County</u>, 225 F.Supp.2d 967 975-76 (E.D. Wis. 2002), the court held that the plaintiff had been denied access to the courts by defendants' hindering his ability to exhaust.

Observing that it is now established beyond doubt that prisoners have a constitutional Right of Access to the Courts, and that recent decisions of the Court had required remedial measures to insure that inmate Access to the Courts was adequate, effective, and meaningful, <u>Bounds v. Smith</u>, (1977) 430 U.S. 817, 52 L.Ed.2d 72, 97 S.Ct. 1491. The Right of Access of Courts is the most important Right, since it protects all other Rights of Citizens. <u>McCarthy v. Madigan</u>, 503 U.S. 140, 153, 112 S.Ct. 1081 (1992) (quoting <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 370 (1886)). This Right is found in the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, the Fourteenth Amendment Equal Protection and Due Process Clauses, and the Privileges and Immunities Clause of Article IV of the Constitution <u>Chroistopher v. Harbury</u>, 536 U.S. 403 415 n.12, 122 S.Ct. 2179 (2002). The Department of Justice and Bureau of Prisons established standards and guidelines for Administrative Remedy exhaustion permitting access to the Courts. However, prison officials intentionally and repeatedly employ tactics declining to provide the required Administrative Remedy Forms, as the filing of such puts on record prison officials' deliberate indifference to protection from a violent prisoner and violations of the Bureau of Prisons policies and procedures. Although, it is well-established by decisions of the Supreme Court that once a State or the Federal Government establishes avenues of appellate review, these must be kept free from unreasoned distinctions, based on economic status, which can only impede open and equal access to the Court. With regard to the federal avenues of review, the Right of Access to the Courts is guaranteed by the Due Process clause of the Fifth Amendment, including that clauses equal protection "component" <u>52 L.Ed.2d 779 § 4.</u>

Shaheed-Muhammad v. Dipaolo, 393 F.Supp.2d 80, 97 (D.Mass. 2005) ("Having failed to abide by the strictures of their own regulations, defendants should not be allowed to claim plaintiff's noncompliance as a bar.") The Supreme Court's earlier decisions on prisoners' Right of Access to the Courts held that prison authorities have no right to suppress or pass judgment upon legal documents which prisoner submit to them. 52 L.Ed.2d 779 § 5. Free the Nipple v. City of Fort Collins, 2019 U.S. App. LEXIS 4596, No. 17-1103 (10th Cir. Feb. 15, 2019) "[A] deprivation of any constitutional Right was irreparable injury." Therefore, it has now been shown that Bureau of Prisons staff have repeatedly violated my Constitutional, procedural and statutorial Rights. Results of which being the inability to properly exhaust Administrative Remedies and preventing Access to the Courts. The only clear remedy being those sought in this Petition.

- 73 -

## X. CONCLUSION

I have shown through facts and points of law that serious violations exist in this instant matter. The Department of Justice's Bureau of Prisons, a system designed to hold people accountable, operates without any actual accountability. And, despite, and sometimes in spite of, written laws, Rights, rules or policies state, the Bureau's staff repeatedly violate Citizens' Constitutional Rights, established laws, policies and procedures. Their overall purpose and goal has become, by any means, to take as much as possible from the confined prisoners under their care, be it: property, liberty, dignity, respect, safety, self-worth, and well-being. And, in this instant matter, they have also labeled me with a badge of infamy, namely, putting in the record that I am now a violent person (Exhibits E & L) without proper jury trial in a Court with a judge in good standing who has sworn to uphold the Constitution.

However, one of the purposes of incarceration and a sentencing factor considered at 18 U.S.C.S. § 3553(a)(2)(A) when imposing a sentence is, "to promote respect for the law...." The actions and conduct of the Defendant certainly do not achieve this purpose or goal. In fact, the contrary is now ingrained and indoctrinated, as the repeated lesson taught is: We have the power, we have the control, you are only a prisoner. We don't care about your rights, the laws, the policies or procedures. We do what we want! And there is nothing you can do about it. The PLRA has only expounded on this attitude by slowing down any and all accountability of federal Bureau of Prisons employees.

The facts in this Case are clear and plain and are also supported by an abundance of law and evidence, and I have done everything in my power to seek resolution and exhaust all available Administrative Remedies. Because this Case deals with Constitutionally protected Rights, which are being deprived to me by the Defendant, this Honorable Court is the only place in which relief can be sought. "[T]he filing of unfounded charges against an inmate offends clearly established constitutional rights...." Freeman v. Rideout, No. 82-234 Civ. (D. Vt. Jan. 2, 1986). "The Constitution tasks the political branches - not the Judiciary - with systematically developing the laws that govern our society. The Court's role, by contrast, is to exercise the 'judicial Power,'" faithfully interpreting the Constitution and the laws enacted by those branches. Art. III, § 1. While "it is always 'tempting for judges to confuse our own preferences with the requirements of law,'" Obergefell v. Hodges, 576 U.S. ___, ___, 135 S.Ct. 2584, 192 L.Ed.2d 609,

640 (2015). And "Courts must be sensitive to... the need for deference to experienced and expert administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals. Courts nevertheless must not shrink from their obligation to enforce the constitutional Rights of all persons, including prisoners. Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." Brown v. Plata, 563 U.S. 493, 131 S.Ct. 1910, 179 L.Ed.2d 969, 2011 U.S. LEXIS 4012 (May 23, 2011). "It is unnecessary for the Constitution to specify that it is superior to other law because it is higher law made by We the People - and the only such law." Kesavan, The Three Tiers of Federal Law, 100 NW.U.L. Rev. 1479, 1499, n.99 (2006). "[O]f course, we are not entitled to interpret the Constitution to align it with our personal sensibilities...." Post, at ___, 204 L.Ed.2d, at 358 (Ginsburg, J. dissenting). As such, many of the violations raised in this Petition are sufficient to raise a substantial question of law or fact. In the words of Supreme Court Justice Gorsuch, "But where uncertainty exists, the law gives way to liberty." United States v. Wooden, No. 20-5279 (S.Ct. Mar. 7, 2022).

The dysfunction surrounding the instant offense is not a one-off but a symptom of a federal prison system in deep crisis. For example, there have been repeated failings across the entire Bureau of Prisons system, with crumbling infrastructure and chronic staffing shortages throughout; repeated sexual abuse of prisoners at Dublin Federal Correctional Institution, pervasive criminal misconduct among its employees leading to more than 100 employee arrests since 2019, the management fiasco at USP Terre Haute, Elkton FCI and Fort Dix - FCI, amongst numerous other facilities that turned into COVID-19 superspreader events, with Fort Dix - FCI setting the record for the worst outbreak of any federal facility, and the highly suspicious death of the most high-profile inmate in America, Jeffery Epstein, in an allegedly constantly-monitored single-cell at MCC New York. Conditions that United States District Court Judge Colleen McMahon identified as "disgusting" and "inhuman" as facilities are "run by morons" who fail to "do anything meaningful." As such, these actions of the Bureau of Prisons and Fort Dix - Federal Correctional Institution's staff, are indicative of systematic injustices that are unconstitutional and unlawful, only affirming the need to correct similiar injustices in this instant matter.

Therefore, I, Jeremiah J. Salamon respectfully moves this Honorable Court to

grant relief from the violations of my Constitutional, procedural and statutorial Rights by the Defendant. I have sufficiently shown indisputable evidence of these violations. The Warden/CEO of Fort Dix - FCI has unlawfully deprived me of Due Process, Liberty interests, Access to the Courts by acting as a gate-keeper, amongst numerous other infringements on my Constitutional Rights.

WHEREFORE, it is with aforementioned facts that I respectfully request this Honorable Court to enter Judgment against the Defendant and enter an Order demanding:

(1) the expunging of Incident Report No. 3405562 (Exhibit A) from the institutional record compiled on me by the Bureau of Prisons and Fort Dix - Federal Correctional Institution;

(2) the expunging of all sanctions imposed by the self-proclaimed "Disciplinary Hearing Officer;" effectuating the restoration of twenty-seven (27) days of Good Time Credits (Exhibit D);

(3) the expunging of any and all references or indications that I am "violent" person/offender from institutional record compiled on me by the Bureau of Prisons and Fort Dix - Federal Correctional Institution, to include but not limited to the Bureau's Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) tool (Exhibit L) and the Bureau Risk and Verification Observation Recidivism (BRAVO-R) tool (Exhibit E);

(4) the correction of the Custody Classification points determined for me by the Bureau of Prisons and Fort Dix - Federal Correctional Institution to the at least before imposed sanctions level of three (3) (Exhibit M);

(5) the ordering of the Bureau of Prisons Fort Dix - Federal Correctional Institution to only conduct Disciplinary Hearings in a manner in which facilitates the use of a recording device such as recorder, (i.e. stenographic transcription, audiotape, digital recording, videotape) for the purpose of obtaining source of Hearing Record that is real, true, accurate and available for future review by the Court(s) of other third-party reviewing body in Appeal;

(6) the ordering of Fort Dix - Federal Correctional Institution and the Bureau of Prisons to cease the practice of conducting Disciplinary Hearings in which a staff officer determination may result in a prisoners' loss of Good Time

Credits (GTC) or any lengthening of their term of incarceration. And, in circumstances where a violation of the Bureaus' rules will result in the loss of GTC or lengthening of a prisoner's term of incarceration, such Disciplinary Hearing must be conducted, that will result in punitive outcome, by an independent third-party mediator or adjudicator who has sworn to uphold the Constitution of the United States who has no affiliation to the Bureau of Prisons. And that the adjudicator must call and present any witnesses requested as long as it does not interfere with institutional security and in the alternative, utilize written statement;

(7) the retraining of all Staff in the prisoners' Constitutional Rights, specifically the First (1st) Amendment Right to Petition the government for redress of grievances and Access to the Courts, to obtain compliance by ceasing the practice of requiring staff initials or signature and date on Administrative Remedy/Grievance Forms, as part of the unwritten facility/staff imposed gate-keeper scheme and practice;

(8) the retraining of all Staff in the Prison Litigation Reform Act (42 U.S.C. § 1997e), 28 C.F.R. § 542.10 et. seq. (Administrative Remedy Program), and 28 C.F.R. § 40.1 et. seq. (Minimum Standards For Inmate Grievance Procedures), to obtain compliance by ceasing the practice of acting as a gate-keeper of the required Administrative Remedy/Grievance Forms, by way of making the Administrative Remedy/Grievance Forms readily and freely accessible in accordance with the Fifth (5th) Amendment Right of Due Process, the Eleventh (11th) Amendment Right to Equal Protection and 28 C.F.R. § 40.7(a), "The procedure for initiating a grievance shall be simple and include the use of standard form. Necessary materials shall be freely available to all inmates and assistance shall be readily available for inmates who cannot complete the form themselves. Forms shall not demand unnecessary technical compliance with formal structure or detail, but shall encourage a simple and straightforward statement of the inmate's grievance." 28 C.F.R. § 40.7(a), et. seq.;

(9) the retraining of all staff so they are in compliance with both State and Federal law, overseen by an independent agency not connected with the Bureau of Prisons, specifically a Court appointed "Special Master" pursuant 18 U.S.C. § 3626 and Fed.R.Civ.P. 53, and/or State of New Jersey Ombudsman, to obtain actual compliance with the Prison Litigation Reform Act (42 U.S.C. § 1997e), 28 C.F.R. § 540.10, et. seq. (Administrative Remedy Program) and 28 C.F.R. § 40.1,

et. seq. (Minimum Standards for Inmate Grievance Procedures) "The Attorney General's regulations, 28 C.F.R. § 40.1 - 40.22, add to the sketchy criteria set out in 42 U.S.C. § 1997e. In several ways they track the statute. But they add at least two requirements: (1) that prisoners participate in the formulation, operation, and assessment of the grievance procedures, §§ 40.2 and 40.7; and (2) that the grievance procedure be given and explained to prisoners..." Lewis v. Meyer, No. 86-1886, 86-2753, 815 F.2d 43; 1987 U.S. App. LEXIS 3938, and to ensure compliance with any Order of this Honorable Court regarding this instant matter;

(10) the ordering and instructing the Office of the C.E.O. and Office of the Warden for Fort Dix - Federal Correctional Institution that it is their duty to train Staff Officers and prisoners alike in the methods of conflict de-escalation when confronted with an aggressive or mentally unstable inmate threatening imminent attack, and to provide and maintain security devices, such as cameras in common areas, that allow for an accurate recording of events after the fact (this facility ONLY has cameras on the outside of its buildings, which is a security and safety risk for all prisoners housed at Fort Dix - FCI), and to provide and maintain "emergency" devices, such as "panic" or "distress" buttons, that allows for the alerting of a need for immediate assistance;

(11) the ordering and instructing the Office of the C.E.O. and Office of the Warden for Fort Dix - Federal Correctional Institution that it is their duty to comply with the Constitution of the United States, and specifically, the Fourteenth (14th), First (1st), Second (2nd), Fifth (5th), Eighth (8th), and Eleventh (11th) Amendments, and any Order from this Honorable Court. And that in refusing to comply, they shall be found to be in Contempt according to 18 U.S.C. § 410, "A Court of the United States shall have Power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as - (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) Misbehavior of any of its officers in their transactions; (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(a) - (c);

(12) an Injunction to prevent any retaliatory action by the Bureau of Prisons and/or Fort Dix - Federal Correctional Institution staff;

- 78 -

(13) the ordering of the removal of the permanently floor affixed concrete benches, a safety hazard, in Fort Dix - FCI housing unit 5841, the only such housing unit with such benches, and,

(14) any other relief this Honorable Court deems appropriate. <u>Discovery House v. Consol. City Of Indianapolis</u>, 319 F.3d 277 (7th Cir. 2003) Federal courts may use any available remedy to make good a wrong done.

The undersigned declares under penalty of perjury, and in accordance with 28 U.S.C. § 1746, that all of the statements made herein are true and correct to the best of the undersigned's knowledge. If called to testify as a witness in this matter, the undersigned could and would competently testify to each of the facts set forth.

Executed on this 31 day of December, 2022.

Jeremiah J. Salamon, In Propria Persona
No. 91052-038
Fort Dix - Federal Correctional Institution
5756 Hartford Street & Pointville Road
Post Office Box 2000
Joint Base McGuire-Dix-Lakehurst, New Jersey
08640-0902